55 A.3d 921

**STATE of Maryland**

v.

**Latresha L. WEEMS.**

**No. 20, Sept. Term, 2012.**

Court of Appeals of Maryland.

Nov. 20, 2012.

330

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

Brian L. Zavin, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BARBERA, J.

To be convicted of theft, a person must take property belonging to someone else with the intent to permanently deprive the owner of it. Maryland's consolidated theft statute includes property that is lost, mislaid, or delivered by mistake. *See* Md.Code (2002, 2012 Repl.Vol.), § 7–104(d) of the Criminal Law Article.[1]

Following a bench trial before the Circuit Court for Anne Arundel County, Latresha L. Weems, Respondent, was convicted of theft for cashing a counterfeit check and not returning the money. She appealed the conviction to the Court of Special Appeals, arguing that the evidence was insufficient to sustain her conviction because the State did not prove that she obtained control over the proceeds of the check knowing the money was delivered by mistake. The Court of Special Appeals agreed and reversed the conviction. We granted the State's request for a writ of certiorari and, for reasons we shall explain, affirm the judgment of the Court of Special Appeals.

## I.

Respondent went to Anchor Check Cashing in Annapolis on February 17, 2009, in order to cash a check. Since 2008, she had been a customer of the business, which is licensed by the State to cash checks and provide other consumer financial

---

1. Criminal Law Article § 7–104(d) provides:

 *Control over property lost, mislaid, or delivered by mistake.*—A person may not obtain control over property knowing that the property was lost, mislaid, or was delivered under a mistake as to the identity of the recipient or nature or amount of the property, if the person:

 (1) knows or learns the identity of the owner or knows, is aware of, or learns of a reasonable method of identifying the owner;

 (2) fails to take reasonable measures to restore the property to the owner; and

 (3) intends to deprive the owner permanently of the use or benefit of the property when the person obtains the property or at a later time.

 All statutory references herein are to this and other sections of the Criminal Law Article.

services. The check stated that it was payable to the order of Respondent in the amount of $3,250, drawn from an attorney escrow account at SunTrust Bank in Atlanta, Georgia. An Anchor employee made a photocopy of the check and told Respondent that Anchor would have to place a phone call to verify that there were funds available before giving Respondent the money.

Marie Coulter, owner of Anchor Check Cashing, arrived later that same day and examined the check for several hours. Coulter also questioned Respondent about why she had the check and Respondent told Coulter that Respondent's uncle had given her the check.[2] Coulter called SunTrust Bank, which verified that the check was "good," and she also called a number provided by Respondent and talked to someone about the check.[3] As a result of that phone call, Coulter testified that she decided to accept the check and release the money to Respondent. Coulter later submitted the check to Anchor's bank, Branch Banking and Trust, for payment. Several days later, the bank returned the check to Anchor, having marked it with a "counterfeit" stamp. Coulter called Respondent twice, explaining that the check was counterfeit, that it was a crime to have cashed the check, and that it would be in Respondent's best interest to return the money. Respondent never returned the money and had no further contact with Anchor.[4]

---

**2.** The Anchor employee who dealt initially with Respondent began to explain at trial how Respondent received the check from her mother or grandmother, but the State cut off the witness before she could finish the explanation. It is unclear from the record how Respondent's mother or grandmother might have been involved in Respondent's obtaining the check.

**3.** At trial, Coulter did not state explicitly what number Respondent gave her to call, or with whom she spoke, but it was presumably someone from the law firm that purportedly issued the check from its attorney escrow account. Coulter had written the word "attorney" on the photocopy of the check, above the telephone number provided by Respondent.

**4.** Coulter offered to relate at trial what Respondent had said to her about why she did not return the money, but the State said it did not

The State charged Respondent by criminal information with theft of more than $500, uttering a forged document, and possession of a forged document. The case came on for a bench trial on October 22, 2009. The State called two witnesses, Coulter and her employee. In addition, the State introduced the copy of the check presented by Respondent and records from the firm named on the check indicating that the check was not one of the checks issued by the firm on that date. The trial court found Respondent guilty of theft but acquitted her of the remaining charges.

In rendering its verdict of acquittal on possessing and uttering a forged document, the trial court stated that it was "not convinced beyond a reasonable doubt that [Respondent] necessarily knew that it was a counterfeit check at the time that she tendered it. There is some circumstantial evidence that that might be the case, but did she know it? ... I don't think the State has proven that she knew it was counterfeit." The trial court ruled, however, that, under § 7–104(d), Respondent was guilty of theft based on a "mistake as to the nature of the property," given that she retained the funds after being told the check was counterfeit. The court sentenced Respondent to one year of incarceration, but suspended all of the sentence except for one day that already had been served. The court also imposed two years of probation and ordered that restitution be paid to Anchor.

Respondent appealed to the Court of Special Appeals claiming the evidence was not sufficient to sustain her conviction. *Weems v. State*, 203 Md.App. 47, 36 A.3d 977 (2012). Specifically, Respondent argued that § 7–104(d), which states that "a person may not obtain control over property knowing that the property was ... delivered under a mistake as to the identity of the recipient or nature or amount of the property," required that the State prove Respondent knew the check was counterfeit at the time she presented it to Anchor. *Id.* at 53, 36 A.3d 977. The State disagreed, arguing that the statute applies

---

want to ask about that and the matter was not pursued on cross-examination.

whenever a person obtains control of property without knowing of a mistake as to its ownership, but later learns of the rightful owner and decides not to return the property. *Id.* at 53, 36 A.3d 977. The Court of Special Appeals noted that, under § 7–104(d), it appeared that knowledge of the mistake must coincide with when a person first obtains control of the property. *Id.* at 58, 36 A.3d 977. Given the uncertainty about the General Assembly's intent regarding when a person must have knowledge of the mistake, the Court reversed Respondent's conviction. *Id.* at 58, 61, 36 A.3d 977. The Court further held that the State had the burden to prove that Respondent failed "to take reasonable measures to restore the property to the owner," *id.* at 59, 36 A.3d 977, reasoning that the State had not presented evidence that Respondent remained in possession of the money, and the trial court erred in inferring this fact based on the available evidence, *id.* at 60–61, 36 A.3d 977.

The State filed with this Court a writ of certiorari to answer the following questions:

1. Are the requirements of § 7–104(d) met if it is shown that a defendant knew that she had obtained property by mistake, learned the identity of the owner, failed to take any measures to restore the property to the owner, and intended to permanently deprive the owner of the property?

2. Was the finder of fact entitled to infer that when [Respondent]—a regular customer of Anchor prior to this incident—learned that she was not entitled to the funds, and yet still refused to return them, she failed to take "reasonable measures" to return the funds?

We granted the petition. *State v. Weems*, 426 Md. 427, 44 A.3d 421 (2012). Because we affirm the Court of Special Appeals and answer "no" to the first question, we do not address the second question.

## II.

█ The State argues that the Court of Special Appeals erred in its interpretation of § 7–104(d) by placing undue

emphasis on the statute's use of the "present-tense" version of the word "obtain" in the language "may not obtain control over property knowing that the property was lost, mislaid, or was delivered under a mistake." The State submits that the intermediate appellate court ignored the General Assembly's intent in enacting the consolidated theft statute, which was to eliminate the common law requirement that a person who received property improperly was guilty of theft only if the person knew at the time of receipt that the property was lost, mislaid, or delivered by mistake. The State contends that a person may obtain property without knowing it was lost, mislaid, or delivered under a mistake and still violate the statute.

The State claims that the Court's interpretation renders portions of § 7–104(d) nugatory. The State points to § 7–104(d)(1), which applies to a person who "knows or learns the identity of the owner . . . or learns of a reasonable method of identifying the owner" as evidence of the General Assembly's intent to apply the statute to those who learn property was lost, mislaid, or delivered by mistake and develop a larcenous intent to steal it *after* taking possession of the property. Additionally, the State notes that § 7–104(d)(3) applies to a person who "intends to deprive the owner permanently of the use or benefit of the property when the person obtains the property or at a later time." The State argues that this subsection must be read in context with the continuing obligations of subsections 1 and 2 that require a person to take reasonable measures to restore property to an owner once learning of the owner's identity. The State adds that, if the statute only targeted people who knew at the time that they received property that it was wrongful, there would be no need for the continuing obligation to identify the owner, and restoring the property would be irrelevant.

The State points to comments from the drafters of Maryland's consolidated theft statute in support of the notion that the legislature wished to change the common law and impose criminal liability on those who develop an intent to steal after receiving lost, mislaid, or misdelivered property. The State

additionally notes that § 7–102(b) defines "knowingly" as the state of mind "when the person is aware of the conduct or that the circumstance exists." The State claims that Respondent had the requisite knowledge as soon as she was informed that the check was counterfeit. In the State's view, Respondent could no longer fall back on an affirmative defense of good faith once she was made aware of the check's fraudulent status and decided to keep the money.

Respondent, not surprisingly, agrees with the rationale and holding of the Court of Special Appeals.

### III.

We rely on the often-cited rules of statutory interpretation in construing the requirements of § 7–104(d):

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.

> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction.

> * * *

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.

*Gardner v. State,* 420 Md. 1, 8–9, 20 A.3d 801 (2011) (quoting *State v. Johnson,* 415 Md. 413, 421, 2 A.3d 368 (2010) (internal quotation marks and citations omitted)).

It is with this guidance in place that we look to the history and purpose behind Maryland's consolidated theft statute. The General Assembly enacted the consolidated theft statute in 1978, combining what were previously seven separate larceny offenses into the one crime of theft.[5] *Kelley v. State,* 402 Md. 745, 751, 939 A.2d 149 (2008). In doing so, the legislature adopted the recommendations of its own Joint Subcommittee on Theft Related Offenses, formed to study the issue. *Id.* The subcommittee's stated intention was to address the "unwieldy and in some cases unintelligible body of statutory and case law" that had developed over the past several hundred years because larceny was divided into multiple categories. Joint Subcommittee on Theft Related Offenses, *Revision of Maryland Theft Laws and Bad Check Laws* 1 (1978). The result of the subcommittee's work was Maryland Code (1957, 1982 Repl.Vol.), Article 27, § 342(d), which was, in pertinent part, identical in substance to today's § 7–104(d):

> (d) *Obtaining control of lost, mislaid or mistakenly delivered property.*—A person commits the offense of theft when he obtains control over property of another which he knows to have been lost or mislaid, or to have been delivered under a mistake as to the identity of the recipient or nature or amount of the property. . . .

In commentary to Article 27, § 342(d), the subcommittee elaborated on property stolen after it has been lost, mislaid, or delivered by mistake:

> It was a crime at common law to deprive the owner of lost property of possession of that property if the finder of the lost property formulated the intent to deprive at the time he found the property. It was reasoned that in order for there

---

**5.** These crimes are larceny, larceny by trick, larceny after trust, embezzlement, false pretenses, shoplifting, and receiving stolen property. § 7–102(a).

to be a larceny at common law, there must be a trespatory taking.

* &ast; &ast; &ast;

In order to avoid this fiction of the common law which requires a nebulous determination of whether there was an intent to deprive at the time the property was found, it was decided that an intent which is formulated at any time with a purpose of depriving the rightful owner of lost, mislaid, or misdelivered property is sufficient to constitute the crime of theft. However, in addition to this intent to deprive, the finder must know the identity of the owner or be aware of a reasonable method of identifying the owner ... *and* fail to take reasonable measures to restore the property to the owner.

Joint Subcommittee on Theft Related Offenses, *Revision of Maryland Theft Laws and Bad Check Laws* 42 (1978).

In enacting a consolidated theft statute, the legislature followed the lead of the Model Penal Code. In § 223.5, "Theft of Property Lost, Mislaid, or Delivered by Mistake," the authors state:

A person who comes into control of property of another that he knows to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of theft if, with purpose to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to have it.

American Law Institute, Model Penal Code and Commentaries § 223.5 (1985). The commentary to § 223.5 notes that the emphasis of this change in the law is away from "an initial fraudulent intent" and onto "a purpose to deprive accompanied by the failure to take reasonable measures to restore." *Id.* At least one legal commentator has interpreted this provision as imputing criminal liability no matter when a person learns that property he or she obtained was lost, mislaid, or mistakenly delivered: "[N]othing depends upon when he discovers the mistake or when he decides to misappropriate the proper-

ty. If he does not learn of the mistake until after he takes delivery, or (if he learns on delivery) if he postpones his decision to steal, he is nonetheless guilty when he fails to take reasonable steps to restore the property." Wayne R. LaFave, *Criminal Law* 979 n. 56 (5th ed.2010).

The subcommittee notes make clear that Maryland lawmakers sought to expand the common law notion of larceny to encompass situations in which a person acquires lost, mislaid, or mistakenly delivered property and later forms the intent to steal it. Indeed, a plain reading of § 7–104(d) supports this notion, as subsection (d)(3) states that intent to permanently deprive the owner of the property can occur "when the person obtains the property *or at a later time.*" (Emphasis added).

Not as clear is whether a person must have the knowledge that the property is lost, mislaid, or mistakenly delivered at the time he or she obtains the property. Subsection (d)(1) refers to a person who "knows *or learns* the identity of the owner or knows, is aware of, *or learns* of a reasonable method of identifying the owner." (Emphasis added). This language supports the idea that a person can be criminally liable if he or she obtains property *and then* learns that it was lost, mislaid, or mistakenly delivered. As the State points out, the phrase "knows or learns" seems to indicate that a person can develop later knowledge, and this interpretation is supported by La-Fave's reading of the Model Penal Code, presuming the General Assembly had a similar intent in passing the consolidated theft statute.

██ But the statute must be read as a whole. In doing so, we "do not read statutory language in a vacuum" or confine our interpretation "to the isolated section alone." *Gardner,* 420 Md. at 9, 20 A.3d 801 (quoting *Johnson,* 415 Md. at 421, 2 A.3d 368). Subsection (d) begins by stating: "A person may not *obtain control over property knowing* that the property was lost, mislaid, or was delivered under a mistake as to the identity of the recipient or nature or amount of the property." (Emphasis added). Article 27, § 342(d), the predecessor to § 7–104, similarly required that a person obtain control over

property "which he *knows to have been* lost or mislaid, or to have been delivered under a mistake." (Emphasis added). This demonstrates that the knowledge requirement has been a necessary element of the offense since the consolidated theft statute was enacted in 1978.

Section 7–102(b) states the definition of "knowing conduct":

(b) *Knowing conduct.*—(1) A person acts "knowingly":

(i) with respect to conduct or a circumstance as described by a statute that defines a crime, when the person is aware of the conduct or that the circumstance exists;

(ii) with respect to the result of conduct as described by a statute that defines a crime, when the person is practically certain that the result will be caused by the person's conduct; and

(iii) with respect to a person's knowledge of the existence of a particular fact, if that knowledge is an element of a crime, when the person is practically certain of the existence of that fact.

Respondent points to the language in § 7–104(d)—"may not obtain control over property knowing"—as indicating that a person must have the knowledge that property is lost, mislaid, or mistakenly delivered *at the time* the person obtains the property. Respondent's interpretation is a plain reading of the statute, particularly in light of the fact that the definition of "knowing conduct" requires that a person be aware that the circumstance in question exists. Furthermore, we find nothing in the legislative history of the statute, or in the Model Penal Code provisions that inspired it, that explicitly contradicts this interpretation.[6]

---

**6.** This interpretation comports with the common law approach to property that is delivered by mistake, as in the case at bar. *See* Wayne R. LaFave, *Criminal Law* 978 (5th ed. 2010) ("It is well settled that the recipient of the mistaken delivery who appropriates the property commits a trespass in the taking, and so is guilty of larceny, if, realizing the mistake *at the moment he takes delivery,* he then forms an intent to steal the property." (emphasis added)).

■ We recognize, as did our colleagues on the Court of Special Appeals, that "the statutory language is not without ambiguity." *Weems*, 203 Md.App. at 54, 36 A.3d 977. When "the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme," we must attempt to clear up the ambiguity. *Gardner*, 420 Md. at 9, 20 A.3d 801 (quoting *Johnson*, 415 Md. at 422, 2 A.3d 368). We do this "by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* A review of the legislative history behind § 7–104(d) does not appear to resolve this challenge. While it seems clear that the General Assembly intended to criminalize situations in which a person takes property and later forms an intent to steal it, it is not clear whether the legislature likewise intended to criminalize a situation in which a person later learns of the lost, mislaid, or mistakenly-delivered nature of the property.

The statute as written specifically indicates that a person can develop later knowledge about the *owner* of the property. Consider a situation in which a woman picks up an umbrella at the entrance to a restaurant, not knowing to whom the umbrella belongs. She knows that it is lost or mislaid, but she does not know the owner and has no intent to steal it. Later, the woman learns that the umbrella belongs to her neighbor, and, rather than return it, decides to keep the umbrella. This would be a criminal act under § 7–104(d) because she knew *at the time she obtained the umbrella* that it was lost or mislaid, she learned of the umbrella's owner, failed to take steps to return the umbrella, and intended to permanently deprive the owner of the umbrella. Contrast this with a situation in which a woman takes an umbrella from a restaurant thinking it is her own. Later, she realizes that it is not hers, but she decides to keep it anyway. We cannot be certain, based on the theft statute as it is written, whether the General Assem-

bly intended to criminalize the conduct exemplified in the latter scenario.

Other provisions within § 7–104 do not resolve the ambiguity in subsection (d). Subsection (c), for instance, criminalizes the possession of stolen property in language that reads: "A person may not possess stolen personal property knowing that it has been stolen, or believing that it probably has been stolen . . . ." § 7–104(c)(1). The statute does not target *obtaining* stolen property knowing it is stolen, but rather *possession* of stolen property knowing it is stolen.

Other subsections criminalize conduct at the point when a person obtains control over the property of another person, but these sections clearly delineate the knowledge required to constitute a crime. Subsection (a) states that "[a] person may not willfully or knowingly obtain or exert unauthorized control over property" and subsection (b) states that "[a] person may not obtain control over property by willfully or knowingly using deception." The use of the phrase "willfully or knowingly" in connection with the acts of obtaining property through "unauthorized control" or "deception" indicates that a person cannot innocently obtain property and violate subsections (a) and (b). This construction would seem to support Respondent's view that subsection (d) and its language that "[a] person may not obtain control over property knowing that the property was lost, mislaid, or was delivered under a mistake" would similarly mean that a person cannot violate subsection (d) without knowing, at the time it is obtained, that the property is lost, stolen, or mistakenly delivered.

The only other criminal provision in Maryland that similarly deals with property that is lost, mislaid, or delivered under a mistake is § 8–204(b). That section, which criminalizes receiving a credit card "known to have been lost or misdelivered," reads: "A person may not receive a credit card that the person knows was lost, mislaid, or delivered under a mistake as to the identity or address of the cardholder and retain possession of the credit card with the intent to use, sell, or transfer it to another who is not the issuer or the cardholder."

§ 8–204(b)(1). The section uses the same basic construction as § 7–104(d), in that both sections require that a person receive property knowing it was lost, mislaid, or delivered under a mistake. The key difference between the two provisions, though, is that § 8–204 deals exclusively with credit cards. Unlike most other personal property, credit cards have the owner's name written on them, making it more difficult for a person innocently to receive one by mistake.

That the General Assembly used similar language in § 7–104(d) and § 8–204(b), both dealing with property that is lost, mislaid, or delivered under a mistake, seems to make it more likely that the legislature intended for the language to stand as written. But studying these provisions, and the legislative history behind them, does not shed conclusive light on the matter.[7]

 It simply is not possible to reach the result the State seeks without adding to or altering the language of the statute, and this is a path we shall not tread. *See Gardner*, 420 Md. at 9, 20 A.3d 801 (quoting *Johnson*, 415 Md. at 421, 2 A.3d 368) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.").[8] When other avenues of statutory

---

7. We have examined the statutes of our sister states dealing with lost, mislaid, and misdelivered property and found that many indicate explicitly that knowledge of a property's status can be formed after a person obtains it and still lead to criminal liability. *See, e.g.*, Ga.Code Ann. § 16–8–6 (2012) ("A person commits the offense of theft of lost or mislaid property when he comes into control of property that he knows or learns to have been lost or mislaid and appropriates the property to his own use without first taking reasonable measures to restore the property to the owner."). Maryland appears to be unique in using the particular language it does in its consolidated theft statute. As such, the laws of other states do not shed much light on the interpretation of the law here.

8. The Court of Special Appeals noted that the addition of the words "or retain" would reach the result sought by the State. If the General Assembly were to amend § 7–104(d) in this fashion, it would read: "A person may not obtain *or retain* control over property knowing that the property was lost, mislaid, or was delivered under a mistake as to the

interpretation fail to resolve an ambiguity, the rule of lenity comes into play. *Gardner,* 420 Md. at 17, 20 A.3d 801 ("Stated simply, the rule of lenity only informs our interpretation of a criminal statute when the standard tools of statutory interpretation fail to discern the intent of the Legislature."). This ultimately means that statutes are strictly construed in favor of the accused. *See, e.g., Moore v. State,* 388 Md. 623, 632, 882 A.2d 256 (2005); *State v. Purcell,* 342 Md. 214, 229, 674 A.2d 936 (1996). In a situation such as this, where contrary interpretations of the statute are possible, we must err on the side of the accused.

We hold that § 7–104(d) applies to someone who obtains property knowing that the property is lost, mislaid, or delivered by mistake and has a concurrent, or later formed, intent to steal it. That statute, as written, does not apply to someone who obtains property *not knowing* at that time that the property is lost, mislaid, or mistakenly delivered. Therefore, the requirements of § 7–104(d) are not met when there is no evidence upon which the factfinder reasonably could find, or when (as here) the judge at a bench trial expressly finds, that the State failed to prove the defendant knew at the time she obtained the property that it had been delivered under a mistake. Our holding stems from the ambiguous nature of the statutory language, the lack of legislative history that resolves the ambiguity, and the rule of lenity's admonition to err on the side of the accused in construing the statute. The judgment of the Court of Special Appeals is affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.**

HARRELL, J., dissents.

HARRELL, J., dissenting.

With even more respect than usual, I dissent. This is a close case; however, I am persuaded by the legislative history

---

identity of the recipient or nature or amount of the property." (additions in italics).

of the relevant statute's antecedent, the 1978 consolidated theft statute, and particularly the report of the Joint Committee on Theft Related Offenses (see majority op. at 337–40, 55 A.3d at 926–28), that Criminal Law Article § 7–104(d) criminalizes Weems's conduct, i.e., upon being notified of the counterfeit status of the check, Weems retained the proceeds and failed to restore them to Anchor Check Cashing after a reasonable time. The polar star for interpreting the perceived ambiguity in the consolidated theft statute in this case is that the Legislature intended to eliminate the common law requirement that a person who received property improperly was guilty of a crime only if the person knew at the time of receipt that it was delivered by mistake. As the majority opinion notes (op. at 338–40, 55 A.3d at 926–27), the Joint Subcommittee, in its commentary accompanying former Article 27 § 342(d), stated:

> In order to avoid this fiction of the common law which requires a nebulous determination of whether there was an intent to deprive at the time the property was found, it was decided that an intent which is formulated at any time with a purpose of depriving the rightful owner of . . . misdelivered property is sufficient to constitute the crime of theft.

Coulter called Weems twice and informed her that the check was determined to be counterfeit and that the money was to be returned to Anchor Check Cashing. Instead, Weems retained the money and refused manifestly to return it. Thus, the necessary *mens rea* arose subsequent to the initial acquisition of the proceeds from the check. Her conviction by the Circuit Court for Anne Arundel County of violating Criminal Law Article § 7–104(d) was correct. Accordingly, I would reverse the judgment of the Court of Special Appeals overturning the conviction.