61 A.3d 794

**Edward Bruce LOWERY, Jr.**

v.

**STATE of Maryland.**

**No. 26, Sept. Term, 2012.**

Court of Appeals of Maryland.

Feb. 28, 2013.

McDonald, J., filed dissenting opinion, joined by Harrell And Barbera, JJ.

478

Russell C. Dashiell, Jr. (Widdowson and Dashiell, P.A., Salisbury, MD), on brief, for petitioner.

Joseph L. Heckwolf, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

GREENE, J.

Section 4–1006.1(e)(3) of the Natural Resources Article of the Maryland Code requires the Maryland Department of Natural Resources to "publish, by public notice, delineations of SAV [submerged aquatic vegetation] protection zones and revisions to SAV protection zones." Md.Code (1973, 2005 Repl.Vol.) § 4–1006.1(e)(3) of the Natural Resources Article (unless otherwise noted, hereinafter all references to the Natural Resources Article will be noted as "NR § " and refer to the 2005 version of the Article). Petitioner, Edward Bruce Lowery, Jr., contends that, in the present case, the Department of Natural Resources failed to fulfill this obligation and that failure serves as a defense against his prosecution for the illegal use of a hydraulic clam dredge in an SAV protection zone in violation of NR § 4–1006.1. We shall hold that: (1) the State failed to establish, among other facts, that the Department of Natural Resources complied with NR § 4–1006.1(e)(3); (2) when prosecuting a waterman for the use of a hydraulic clam dredge in an SAV zone in violation of NR § 4–1006.1 the State must establish as an element of its case that the Department of Natural Resources effectively complied with Section 4–1006.1(e); and (3) the State's failure to establish the Department of Natural Resources's compliance with subsection (e)(3) invalidates Lowery's prosecution for his alleged violation of NR § 4–1006.1.

## I. Statement of Facts and Procedural History

Petitioner, Edward Bruce Lowery, Jr. ("Lowery") is a waterman with a commercial license, issued by the Maryland Department of Natural Resources ("DNR"), to harvest clams. On June 17, 2011, Lowery was operating a boat and clamming in or near Cook's Point Cove in Dorchester County, Maryland. As Lowery was clamming, he was approached by Natural Resources Police Sargeant Randall Bowman ("Sgt. Bowman").

Sgt. Bowman cited Lowery for using a hydraulic clam dredge [1] (a "HCD") in an SAV protection zone ("SAV zone") in violation of NR § 4–1006.1. NR § 4–1006.1(f) provides that "[a] person may not use the following gear in an SAV [submerged aquatic vegetation] protection zone ... [a] hydraulic clam dredge...."

An SAV zone is an area within a body of water set aside, or delineated, by DNR where the use of certain commercial fishing equipment is prohibited in order to protect the growth of submerged aquatic vegetation, or sea grass, on the floor of the body of water. *See* NR § 4–1006.1(a)(3). In 1998, the Maryland General Assembly enacted NR § 4–1006.1. *See* 1998 Md. Laws, Chap. 385. The original version of NR § 4–1006.1 prohibited the use of HCDs in SAV zones and required DNR to delineate SAV zones and update the location of SAV zones. *See* NR § 4–1006.1 (1974, 1997 Repl.Vol., 1999 Cum.Supp.). In 2002, NR § 4–1006.1 was amended. *See* 2002 Md. Laws, Chap. 527. In the 2002 amendment, the General Assembly added, among other changes, subsection (e), stating:

[DNR]:

(1) Shall utilize buoys or other visible landmarks as appropriate to mark SAV protection zones;

(2) May make revisions to the delineations of SAV protection zones at any time if determined to be necessary; and

(3) Shall publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones.

*See* NR § 4–1006.1(e) (1973, 2000 Repl.Vol., 2002 Cum.Supp.); 2002 Md. Laws, Chap. 527.

On September 21, 2011, the District Court for Dorchester County convicted Lowery, finding him guilty of violating NR § 4–1006.1, and imposed a criminal fine and costs in the amount of $300. *See* NR § 4–1201(a) (1973, 2005 Repl.Vol.,

---

1. A hydraulic clam dredge is "any device used for dredging clams which consists of a manifold through which water is forced under pressure for the purpose of digging clams and working them into the mouth of the dredge where the clams then are brought up to boat level by means of an escalator." NR § 4–1001(m).

2011 Cum.Supp.). Lowery appealed his conviction to the Circuit Court for Dorchester County. The appeal was heard *de novo.*

At the outset of the Circuit Court trial, counsel for Lowery raised the issue that DNR failed to fulfill its obligations under subsection (c). These obligations require DNR to "utilize buoys or other visible landmarks as appropriate to mark SAV protection zones[,]" and "publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones." *See* NR § 4–1006.1(e). When presenting its case, the State called three witnesses, Sgt. Bowman, another Natural Resources Police Officer, Officer Elizabeth Tyler, and Louis Wright, a hydrographer who was responsible for mapping the SAV zone in Cook's Point Cove for purposes of presenting an exhibit for trial. Additionally, over the objection of Lowery's counsel, the State entered into evidence a number of exhibits. Included among the exhibits was State's Exhibit 12, entered as evidence that DNR had published notice of the SAV zone.

State's Exhibit 12 is a three page document. The first page is a signed statement from the Director of the Fisheries Service, certifying, under penalty of perjury, the validity of the attached documents. The second page of the Exhibit purports to be a copy of a public notice published by DNR. The text of the document states:

### PUBLIC NOTICE

### MARYLAND DEPARTMENT OF NATURAL RE-SOURCES DELINEATIONS OF SUBMERGED AQUATIC VEGETATION (SAV) FOR DORCHESTER, TALBOT, ST. MARY'S AND SOMERSET COUNTIES

The Secretary of Maryland Department of Natural Resources (DNR) announces amended delineations of the submerged aquatic vegetation (SAV) beds in St. Mary's, Dorchester, Talbot and Somerset Counties. These amended delineated areas are protected and closed effective 12:01 a.m., Friday, August 1, 2003 to the use of hydraulic clam dredges under Section 4–1006.1 of the Natural Resources

Article of the Annotated Code of Maryland. Under the provisions of this legislation, DNR is required to delineate existing SAV beds in the waters of the State.

Amended delineations are effective in the following areas:

**St. Mary's County,** St. George Creek, St. Mary's River and Calvert Bay;

**Dorchester County,** Okahanikan Cove, Pone Cove, Holland Straits, Northeast Cove, Piney Island Cove, Brannock Bay, Cook's Point Cove, Todds Point Cove;

**Talbot County,** Blackwalnut Cove, Upper Bar Neck Point, Tilghman Island; and

**Lower Eastern Shore Somerset County,** Bloodsworth Island, Manokin River, Big Annemessex River, South March Island, Smith Island and Little Annemessex River.

Areas closed by Maryland Department of the Environment (MDE) for health reasons and areas closed pursuant to other statutory or regulatory authority remain closed.

Detailed charts defining these delineations may be obtained by contacting Louis Wright, NRP Hydrographic Operations, 303 Marine Academy Drive, Stevensville, MD 21666, or telephone (410) 643–6521. Descriptions of these delineations are also available by contacting Frances McFaden (410) 260–8265.

### C. Ronald Franks
Secretary
Maryland Department of Natural Resources.

The final page of State's Exhibit 12 lists the publications in which the notice was published. While there is a long list of potential publications, Exhibit 12 indicates that the public notice was published in only two of those publications, the Saturday, July 26, 2003 issue of the Baltimore Sun Newspaper and the August issue of the Waterman's Gazette Newsletter.

At the conclusion of the Circuit Court trial, the trial judge summed up the case and entered a guilty verdict, indicating:

Really ... the issue which [Lowery's counsel] identified, which I had to think about perhaps most, is whether or not

the publication provision is satisfied by the evidence that's been presented. . . .

Does [NR § 4–1006.1(e)(3) ] require a notice that an area has been delineated within a particular body of water, or does it require the publication of the actual metes and bounds of the area which is delineated? . . .

And it seems to me that the notice that was published in this particular case, that is State's Exhibit Number 12, which says that, provides notice that Cook's Point Cove is subject to or has been delineated as an SAV area, is satisfactory to satisfy the requirements of that particular code section. Particularly when that notice does provide that the actual detailed metes and bounds or chart of that specific area can be obtained, and providing information where that can be obtained.

So, having said all of this, I think the [Circuit] Court's conclusion is that I am satisfied beyond a reasonable doubt that on this particular date that [Lowery] was operating [the boat identified by Sgt. Bowman illegally using a HCD] when it was observed by Sargeant Bowman actively clamming well within the SAV protection zone of Cook['s] Point Cove, and so I'm going to find him guilty with respect to the charged offense.

After concluding that Lowery was guilty of the charged offense, the Circuit Court judge imposed a fine of $250 and $45.50 in court costs for a total of $295.50. Because in the present case, the Circuit Court sat as an appellate court, pursuant to Section 12–305 of the Courts and Judicial Proceedings Article,[2] Lowery filed a petition for a writ of certiorari directly to this Court,[3] which we granted, 426 Md. 430, 44 A.3d 423 (2012), to consider the following questions:

---

**2.** Md.Code (1974, 2006 Rcpl.Vol.) § 12–305 of the Courts and Judicial Proceedings Article.

**3.** Along with the grant of *certiorari,* we also granted Lowery's motion to stay the administrative proceedings to revoke Lowery's commercial fishing license that arose as a result of Lowery's conviction in the present case. The State challenges our decision to grant the stay,

1. Whether the Maryland Department of Natural Resources has complied with its statutory duty to publish specific delineations of SAV (submerged aquatic vegetation) protection zones when the only public notice maintained by the Department as offered by it at trial consisted of a one page 2003 statement by the then Department Secretary announcing amended delineations in various areas of the Chesapeake Bay, while containing no actual delineations other than a reference to the phone numbers of two Department employees identified as having information as to the delineations themselves.

2. Whether the Maryland Department of Natural Resources has ever actually published and given public notice of the delineation of SAV protection zones for the Chesapeake Bay and its tributaries when the 2003 legal notice certified by its Director of Fisheries listed numerous publications and locations within the State primarily on the Eastern Shore and Southern Maryland yet only identified one instance of publication of same on Saturday, July 26, 2003 in the Baltimore [Sun Newspaper].

## II. Analysis

Lowery does not appear to contest the trial court's determination that he used a HCD in an SAV zone. Rather, he contends that he cannot be prosecuted for using the HCD in the SAV zone because DNR failed to fulfill its obligation pursuant to NR § 4–1006.1(e)(3). Thus, our review of this case rests on three issues: (1) what is required of DNR to comply with NR § 4–1006.1(e)(3); (2) whether the State has established that DNR has complied with the statute; and (3) if the State must establish as an element of its case against

arguing that the administrative proceeding "is not within the appellate jurisdiction of this Court because in the administrative proceeding there has been no final agency action, no petition for judicial review, and no appeal noted to the Court of Special Appeals." Because the stay was "granted during the pendency of this matter before the Court of Appeals[,]" the issuance of this decision renders the State's challenge to the stay moot.

Lowery that DNR has effectively complied with NR § 4–1006.1(e)(3). After reviewing these three issues, we conclude that the State has not established that DNR "publish[ed], by public notice, delineations of SAV protection zones and revisions to SAV protection zones[,]" as required by NR § 4–1006.1(e)(3), and that because DNR's compliance with NR § 4–1006.1(e)(3) is an element of the State's case, Lowery's conviction is invalid.

■ Lowery's conviction in the Circuit Court was rendered after a bench trial. In *State v. Neger*, 427 Md. 582, 50 A.3d 591 (2012), we noted the standard we apply when reviewing a conviction after a bench trial:

When the conviction is rendered after a bench trial, we review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses. The clearly erroneous standard, however, does not, of course, apply to legal conclusions. For legal conclusions, we conduct a non-deferential review.

427 Md. at 595, 50 A.3d at 599 (quotations omitted); *see also Clancy v. King*, 405 Md. 541, 554, 954 A.2d 1092, 1099 (2008). We are asked in the present case to determine what is required of DNR pursuant to NR § 4–1006.1(e)(3) and whether DNR's compliance with subsection (e)(3) is an element of a prosecution for a violation of NR § 4–1006.1. Both of these questions require that we engage in statutory interpretation to determine the intention of the General Assembly in drafting NR § 4–1006.1. When engaging in statutory interpretation, "[w]e review a trial court's interpretation of a statute through a non-deferential prism." *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 350, 36 A.3d 399, 409 (2012) (citations omitted). *See also Harvey v. Marshall*, 389 Md. 243, 257, 884 A.2d 1171, 1179 (2005) (citations omitted) ("[The petitioner's] question is one of statutory interpretation and, as such, is purely a legal one. We therefore review the matter *de novo*.").

■ We begin our analysis by determining what NR § 4–1006.1(e)(3) requires of DNR. In other words, we interpret the meaning of the mandate that DNR "[s]hall publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones." [4]

In affirming Lowery's conviction, the Circuit Court judge concluded that "the notice that was published in this particular case, that is State's Exhibit Number 12 . . . is satisfactory to satisfy the requirements of [NR § 4–1006.1(e)(3) ]." Lowery asserts that the trial judge "erred as a matter of law by misinterpreting the language of NR § 4–1006.1(e)(3) dealing with the express requirement that the actual delineations of the SAV protection zones be published by [DNR] to accord the public, including [ ] Lowery, notice of the same." Lowery argues that the plain language and the legislative history surrounding NR § 4–1006.1(e)(3) indicates that DNR is required to publish specific information about the locations of SAV zones. In addition, he references State's Exhibit 7, an August 19, 2003 listing of the latitudinal and longitudinal coordinates for the SAV zones in, among other places, Cook's Point Cove, which Lowery contends are the "actual delineation coordinates for Cook's Point Cove." Lowery asserts these "actual delineations" were "maintained by [DNR]," but never

---

4. NR § 4–1006.1(e)(1) also requires that DNR "[s]hall utilize buoys or other visible landmarks as appropriate to mark SAV protection zones[.]" The transcript of the Circuit Court trial and the briefs of the parties indicate that the parties dispute whether DNR fulfilled its obligation to provide this "on-site" notice through buoys and other visible landmarks. The two questions for which we granted certiorari, however, pertain only to DNR's publication obligations. The plain language of NR § 4–1006.1(e) indicates that DNR "[s]hall utilize buoys . . . ; and [s]hall publish. . . ." The General Assembly's use of the word "shall" in both situations makes it clear that DNR is required to both provide on-site notice *and* "publish . . . delineations of . . . and revisions to SAV protection zones." Thus, even if DNR provided adequate on-site notice, DNR would not have complied with NR § 4–1006.1(e) if it failed to meet the requirements of NR § 4–1006.1(e)(3). Because we conclude that DNR did not fulfill its obligation to "publish, by public notice, delineations of . . . and revisions to SAV protection zones," we need not, and do not, reach whether DNR provided adequate on-site notice.

published and "[n]o conviction could be sustained if [DNR] had failed to publish the actual SAV delineations."

The State, on the other hand, contends:

The mere use of the term "delineations" in § 4–1006.1(e)(3) does not require [DNR] to publish detailed charts or coordinates in a public notice. Other provisions of Maryland shellfish law specifically require that [DNR] publish maps and coordinates describing specific areas.... Section 4–1006.1 contains no such requirement.[5] Indeed, the General Assembly rejected amendments to the SAV legislation that would have required [DNR] to "adopt regulations that provide the latitude and longitude coordinates for the placement of buoys to delineate areas in which the use of a [HCD] is prohibited." [6] ... This legislative history and the distinction in the publication requirements imposed upon [DNR] in other sections directly following NR § 4–1006.1 are strong indications that the General Assembly did not intend for [DNR] to publish detailed coordinates or

---

**5.** As noted below, the plain meaning of "publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones" is unambiguous. Thus, unlike the approach taken by the State and the dissenting opinion, we do not look to other statutes and laws for reasons to diverge from the plain meaning of the language contained in NR § 4–1006.1(e)(3). *See Hastings v. PNC Bank, NA,* 429 Md. 5, 36, 54 A.3d 714, 732 (2012) (quotations omitted) ("We do not add or delete words from an unambiguous statute, nor do we entertain a forced or subtle interpretation that extends or limits a statute's meaning. When a statute's plain language is unambiguous, we need only to apply the statute as written, and our efforts to ascertain the legislature's intent end there."); *Smack v. Dep't of Health and Mental Hygiene,* 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003) (quotations and citations omitted) ("Words may not be added to, or removed from, an unambiguous statute in order to give it a meaning not reflected by the words the Legislature chose to use, nor may we engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning.").

**6.** The State cites to the original enactment of NR § 4–1006.1 in 1998 for this proposition. NR § 4–1006.1(e)(3)'s obligations were added to the law as part of the 2002 amendment to the law. Therefore, the legislative history surrounding the drafting of the earlier law, which did not include subsection (e)(3) and its obligation to publish delineations and revisions of SAV zones, does not inform our interpretation of the meaning of NR § 4–1006.1(e)(3).

maps, as Mr. Lowery contends, by using the term "delinea-tion" in § 4–1006.1(e)(3). A general geographic description is a sufficient delineation, particularly when detailed charts are available to anyone upon request.

As noted, we determine what is specifically required by NR § 4–1006.1(e)(3) through statutory interpretation. We have many times articulated the path taken by this Court when determining the meaning of statutory language:

> In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. If, however, the language is subject to more than one interpretation, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statuto-ry scheme as a whole considering the purpose, aim, or policy of the enacting body, and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

*Doe v. Montgomery Cnty. Bd. of Elections,* 406 Md. 697, 712–13, 962 A.2d 342, 350–51 (2008) (quotations and citations omitted).

We begin by looking to the text of the statute requiring DNR to "publish, by public notice, delineations of SAV protec-tion zones and revisions to SAV protection zones." To discern what DNR must publish we determine the meaning of the two key words in that phrase, "delineations," and "revisions."

First, we look to see if the terms are defined in the statute. *See Chow v. State,* 393 Md. 431, 444–45, 903 A.2d 388, 396 (2006). In this case, the terms are not defined by the statute, and so, because we are determining the meaning of the language as it was written by the General Assembly, we turn to a dictionary that is contemporaneous with the drafting and enacting of the language in the statute giving rise to the obligation. *See Harvey,* 389 Md. at 260–61 n. 11, 884 A.2d at 1181 n. 11 (2005); *See also Whitley v. Md. State Bd. of Elections,* 429 Md. 132, 152–53, 152–53 n. 28, 55 A.3d 37, 49–50, 49–50 n. 28 (2012) (using a dictionary to discern the meaning of critical words in a statute), *Chow,* 393 Md. at 445–47, 903 A.2d at 396–97 (same). The requirements of NR § 4–1006.1(e)(3) were first added as part of the 2002 amendment to the law. *See* 2002 Md. Laws, Chap. 527. Therefore, we look to a 2002 dictionary. From the definitions in that dictionary, the plain meaning of the phrase appears clear and unambiguous.

The dictionary offers the following definitions for the word "delineation:"

1. "[T]he act of representing, portraying, or describing (as by lines, diagrams, sketches)"

2. "[A]ccurate and precise graphic representation as distinguished from that which is careless or sketchy as to details"

3. "[S]omething (as a diagram, picture, description) made by delineating"

Webster's Third New International Dictionary of the English Language Unabridged 597 (2002) (hereinafter "Webster's Dictionary"). The dictionary further defines the word "delineate" as:

1. "[T]o indicate by lines drawn in the form or figure of: represent by sketch, design, or diagram: sketch out: portray, picture; specif[ically]: to represent in drawing and engraving by lines (as with pen, pencil, or graver)"

2. "[T]o represent with accuracy and minute attention to detail"

3. "[T]o describe in detail esp[ecially] with sharpness or vividness"

Webster's Dictionary at 597. Looking to these definitions, the plain meaning of a "delineation" is either an "accurate and precise graphic representation as distinguished from that which is careless or sketchy as to details" or "something . . . made by delineating," which is the act of representing "by sketch, design, or diagram" or "with accuracy and minute attention to detail" or "with sharpness or vividness." In other words, a delineation would be either an accurate and precise graphic representation or a representation made either by sketch, design, or diagram, or with accuracy and minute attention to detail. An accurate and precise graphic representation or a representation made by diagram would likely be a map or chart of the SAV zones. A representation made with accuracy and minute attention to detail could be a written description, but would have to be a description with specific detail or the precise coordinates of the SAV zones.

■ Finally, the dictionary defines the word "revision" to mean "something made by revising: a revised form or version[.]" Webster's Dictionary at 1944. The dictionary further defines the word "revise" as "to make a new, amended, improved, or up-to-date version of[.]" Webster's Dictionary at 1944. In ascertaining the meaning of "revisions," we note that in statutory interpretation, we interpret the meaning of a word in the context of the entire statute so as to arrive at a definition that is reasonable and not "absurd, illogical, or incompatible with common sense." *Bd. of Educ. v. Marks–Sloan*, 428 Md. 1, 19, 50 A.3d 1137, 1148 (2012) (quotation omitted). Therefore, looking at the definition of the word "revisions" within the phrase "publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones[,]" we conclude that the logical interpretation is that it refers back to delineations and means new, amended, improved, up-to-date, or corrected delineations of an SAV zone. Thus, NR § 4–1006.1(e)(3) requires DNR to publish maps or written descriptions with specific details of SAV zones. In addition, the statute requires DNR to publish new, amended, improved, up-to-date, or corrected versions of the same.

Because the meaning of the language is unambiguous, it is unnecessary for this Court to engage in further analysis of what is required of DNR. We simply apply the statute as it reads. *See Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426, 427 (2002) ("If the words of a statute are clear and unambiguous, our inquiry ordinarily ends and we need investigate no further, but simply apply the statute as it reads.").

At trial, the State offered a number of exhibits. The only evidence submitted, however, of DNR's publication of notice about the location of the SAV zone in Cook's Point Cove was the public notice entered as State's Exhibit 12 (hereinafter the 2003 Public Notice).[7] When the Circuit Court judge concluded that DNR had fulfilled its obligations pursuant to NR § 4–1006.1(e)(3), he stated that this conclusion was based on his belief that "the notice that was published in this' particular case, that is State's Exhibit Number 12 ... provides notice that Cook's Point Cove is subject to or has been delineated as an SAV area, is satisfactory to satisfy the requirements of [NR § 4–1006.1]. Particularly when that notice does provide that the actual detailed metes and bounds or chart of that specific area can be obtained, and provid[es] information where that can be obtained."

NR § 4–1006.1(e)(3) requires DNR to "publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones." The 2003 Public Notice contained three pieces of information, none of which constitutes "delinea-

---

7. State's Exhibit 7, a faxed lists of the latitudinal and longitudinal coordinates of SAV zones in, among other areas, Cook's Point Cove, was entered at trial as the basis for the map created for trial. Counsel for the State, however, indicated that it was not entered as evidence of publication to the public. Additionally, State's Exhibit 8, a public notice that indicates amendments, using specific longitudinal and latitudinal coordinates, to certain SAV zones, was entered at trial. That public notice, however, does not mention an SAV zone in Cook's Point Cove and indicates that it is effective November 7, 2011. Because the underlying offense in the present case occurred in Cook's Point Cove on June 17, 2011, the notice entered as Exhibit 8 does not constitute evidence that DNR met its obligation's under NR § 4–1006.1(e)(3) in the present case.

tions" or "revisions" of SAV zones. First, through the public notice, DNR stated that the new SAV zones were effective at 12:01 a.m. on Friday, August 1, 2003. Second, the public notice indicated that there was an SAV zone in, among other places, Cook's Point Cove. And finally, the public notice listed the names and contact information for two DNR employees, from whom members of the public could obtain the specific location of the SAV zones.

Examining what was actually published, DNR did not comply with NR § 4–1006.1(e)(3). The 2003 Public Notice did not specify where a waterman could use an HCD. Rather, from the list of general locations of SAV zones, the public was informed that there are SAV zones somewhere within certain bodies of water where the use of HCDs is prohibited. And from the list of DNR employees, the public would know where to obtain information about the specific locations of the SAV zones. The law, however, does not require DNR to simply publish information about where the public can obtain "delineations of . . . and revisions to SAV protection zones." NR § 4–1006.1(e)(3) requires DNR to publish the actual delineations and revisions to the public.[8] In short, the 2003 Public Notice fails to fulfill DNR's statutory duty pursuant to NR § 4–1006.1(e)(3).[9, 10]

As we have stated that the State has failed to establish that DNR complied with NR § 4–1006.1, we next determine

---

**8.** In order to effectively comply with NR § 4–1006.1(e)(3), the publication would need to be reasonably calculated to give advanced notice to watermen of the delineations of and revisions to SAV zones. Timely publication on DNR's website would be one way to effectively comply with this requirement.

**9.** The State argues that we should give deference to DNR's interpretation of what is required by NR § 4–1006.1(e)(3), and whether those requirements have been met. As we note, what is required pursuant to NR § 4–1006.1(e)(3) is a matter of statutory interpretation, which is a question of law. *See Harvey v. Marshall*, 389 Md. 243, 257, 884 A.2d 1171, 1179 (2005) (citation omitted) ("[The petitioner's] question is one of statutory interpretation and, as such, is purely a legal one."). We conclude that DNR erred in its interpretation of NR § 4–1006.1(e)(3), and "reviewing courts are under no constraint to affirm an agency

what effect this failure had on Lowery's prosecution. The State contends that DNR's failure to comply with NR § 4–1006.1(e)(3) does not preclude Lowery's prosecution for violating NR § 4–1006.1. Lowery, on the other hand, seeks the reversal of his conviction based on this omission. Because the trial court found that DNR complied with NR § 4–1006.1(e)(3), the court did not directly address the result a failure to comply would have on Lowery's prosecution.

The obvious purpose of the statutory requirement, to "publish, by public notice, delineations of SAV protection zones and revisions to SAV protection zones" is to provide advanced notice to commercial watermen who intend to use otherwise lawful fishing equipment in areas designated as SAV zones. Examining NR § 4–1006.1 in its entirety, and in accordance with the notice requirement, we are persuaded that to prosecute Lowery for violating NR § 4–1006.1, the State must prove as an element of its case, among other things, that DNR published delineations and revisions of the SAV zone in Cook's Point Cove. The State's failure to establish DNR's compliance with the mandated notice requirements invalidates Lowery's prosecution.

The State asserts that "[i]t would defeat the legislative intent to interpret a deficiency in the notice required by § 4–

decision premised solely upon an erroneous conclusion of law." *Ins. Comm'r v. Engelman*, 345 Md. 402, 411, 692 A.2d 474, 479 (1997) (citations omitted). Moreover, the plain meaning of NR § 4–1006.1(e)(3) is unambiguous and "when a statutory provision is entirely clear, with no ambiguity whatsoever, administrative constructions, no matter how well entrenched, are not given weight." *Md. Aviation Admin. v. Noland*, 386 Md. 556, 572, 873 A.2d 1145, 1155 (2005) (quotation omitted).

10. Because we conclude that what was published, *i.e.*, a list of the general locations of SAV zones and the contact information of two DNR employees who can provide specific locations, was insufficient pursuant to NR § 4–1006.1(e)(3), we need not, and do not, determine if publishing delineations and revisions of SAV zones for one day in the Baltimore Sun Paper and in one edition of the Watermen's Gazette satisfied DNR's obligations pursuant to NR § 4–1006.1(e)(3).

1006.1(e)(3) to permit a person to dredge a marked and delineated SAV protection zone," because DNR "is not required to issue public notice to *establish* an SAV protection zone; SAV protection zones are created once [DNR] delineates them." (Emphasis in original). Additionally, the State argues that the language of NR § 4–1006.1(f) does not mention a notice requirement or that the State is required to show that a person acted "knowingly" or "intentionally," and, thus, a violation of NR § 4–1006.1 is a "strict liability public welfare offense." The State further asserts that, therefore, "the State was not required to prove that [DNR] published the notice required by § 4–1006.1(e)(3) in order to prove Lowery's guilt of the offense of using prohibited gear in an SAV protection zone." At oral argument before this Court, counsel for the State summarized the State's argument stating, "the elements of the offense are that there's an SAV zone that's been delineated by [DNR], and a person is using one of several types of prohibited gear in that zone. Notice is not a requirement for enforcing [the law]."

The State's arguments assume that provisions of a statute can be read in a vacuum, *i.e.*, that because the subsection which specifically prohibits the use of HCD in SAV zones, subsection (f), does not explicitly reference DNR's publication duties, these duties are distinct from a prosecution under NR § 4–1006.1(f). This is an incorrect assumption. As we have stated:

> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

*Lockshin v. Semsker,* 412 Md. 257, 275–76, 987 A.2d 18, 29 (2010) (citations omitted). Furthermore, we read the larger statute "so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 577, 870 A.2d 186, 193 (2005) (quotations omitted); *See also Chow,* 393 Md. at 453, 903 A.2d at 401 (interpreting the word "transfer" so as to avoid making any other language in the larger statute "surplusage language").

If we were to interpret NR § 4–1006.1 as not requiring the State to establish as an element of its case that DNR published "delineations" and "revisions" of the SAV zones, NR § 4–1006.1(e)(3) would be rendered meaningless and the language superfluous. Within NR § 4–1006.1, subsections (b), (d), and (e)(2) either require or authorize DNR to delineate or revise the delineations of SAV zones. And, NR § 4–1006.1(f) prohibits the use of HCDs and other identified pieces of equipment in SAV zones. Thus, if the General Assembly intended that the only requirements to sustain a violation of NR § 4–1006.1 was that DNR delineated or revised the delineations of an SAV zone and that an offender used an HCD, or other prohibited equipment, in that zone, it would have been unnecessary for the General Assembly to have included subsection (e)(3). To ensure that subsection (e)(3) is not rendered meaningless, we conclude that when prosecuting a violation of NR § 4–1006.1, the State, in its prima facie case, must establish that DNR complied with NR § 4–1006.1(e) in addition to proving that a person was using prohibited equipment in an area that had been delineated as an SAV zone.

This is in accordance with this Court's judgment in *Hirsch v. Dep't of Natural Resources,* 288 Md. 95, 416 A.2d 10 (1980). In that case, we held that regulations prohibiting persons from, among other things, filling in dirt in areas designated as private wetlands without a permit were ineffective unless DNR complied with the statute's requirement that DNR file maps of the wetland and the order establishing the boundaries of the wetland "among the land records . . . ." 288 Md. at 102, 110, 116, 118, 416 A.2d at 14, 18, 21, 22. In reaching this conclusion we noted:

If the legislature had intended ... that the regulations were to be effective without the filing of the maps and order, then little purpose would be served by the statutory requirement. Such a construction would render the statutory language, and its underlying purpose, surplusage. This is a result which courts strive to avoid. Furthermore, conditioning the validity of the rules and regulations upon compliance with the statute's filing requirements would appear to be the only effective sanction for a failure to fulfill these requirements.

288 Md. at 116, 416 A.2d at 21 (citations omitted). Similarly, the prohibition upon the use of HCDs and other prohibited equipment listed in NR § 4–1006.1(f) is ineffective unless DNR complies with NR § 4–1006. 1(e)(3)'s publication requirements.

 As noted above, the State and the dissenting opinion in this case assert that a violation of NR § 4–1006.1 is a strict liability offense, and scienter need not be proven in a prosecution for a violation of NR § 4–1006.1(e). The larger statutory scheme, the legislative history of the law, and the general preference in this Court, and throughout American legal systems, for requiring *mens rea*, however, indicate that a violation of NR § 4–1006.1 is not a strict liability offense. Rather, the language of NR § 4–1006.1(e) indicates that as an element of the offense, DNR must provide the specific notice: That it "utiliz[ed] buoys or other visible landmarks as appropriate," and "publish[ed], by public notice, delineations of ... and revisions to SAV protection zones."

 In the past, we have stated that the absence of explicit *mens rea* language in a statute "does not necessarily make [a violation of the law] a strict liability offense." *Central Collection v. Jordan*, 405 Md. 420, 430, 952 A.2d 266, 272 (2008) (citations omitted); *see also Outmezguine v. State*, 335 Md. 20, 41, 641 A.2d 870, 881 (1994) (citations omitted) ("In the past ... we have read a knowledge requirement into statutes despite the fact that the statutes plainly did not include such a requirement."). As Chief Judge Murphy wrote for this Court:

At common law, a crime occurred only upon the concurrence of an individual's act and his [or her] guilty state of mind.

In this regard, it is well understood that generally there are two components of every crime, the *actus reus* or guilty act and the *mens rea* or the guilty mind or mental state accompanying a forbidden act. The requirement that an accused have acted with a culpable mental state is an axiom of criminal jurisprudence.

*Garnett v. State*, 332 Md. 571, 577–78, 632 A.2d 797, 800 (1993) (citation omitted). In fact, we have noted that this Court is "reluctant to read into criminal statutes an intent of the legislature to forego a mens rea requirement." *Owens v. State*, 352 Md. 663, 671, 724 A.2d 43, 47 (1999); *see also* Stephen J. Morse, *Inevitable Mens Rea*, 27 Harv. J.L. & Pub. Pol'y 51 (2003) ("As long as we maintain the current conception of ourselves as intentional and potentially rational creatures, as people and not simply as machines, the mens rea requirement in criminal law is both inevitable and desirable.").

In the past, we have interpreted various statutes as requiring some form of *mens rea* even when the statute was silent on the requirement. *See State v. McCallum*, 321 Md. 451, 457, 583 A.2d 250, 253 (1991); *Warfield v. State*, 315 Md. 474, 496–97, 554 A.2d 1238, 1249–50 (1989); *Dawkins v. State*, 313 Md. 638, 651, 547 A.2d 1041, 1047 (1988). On other occasions, however, we have concluded that the omission of *mens rea* language in a statute indicated that the General Assembly either intended the offense to be a strict liability offense or at least intended that a lack of knowledge not be available as a defense. *See Jordan*, 405 Md. at 434, 952 A.2d at 275; *Outmezguine*, 335 Md. at 44–45, 641 A.2d at 882; *Garnett*, 332 Md. at 584–85, 632 A.2d at 803–04.

When we have read the absence of explicit *mens rea* language in a statute as an indication that the statute imposed strict liability or precluded a lack of knowledge defense, we have generally done so after finding that there is clear indications in either the larger statutory language or the legislative history of the law that the General Assembly intended that result. In *Jordan*, we concluded that failing to maintain insurance on a truck registered to the defendant in violation of Section 17–106 of the Transportation Article in the Maryland

Code was a strict liability offense. We noted that the next section of the Transportation Article, Section 17–107, was enacted by the same bill in the General Assembly that renumbered and revised Section 17–106, and while the General Assembly included explicit *mens rea* language in 17–107, it did not in 17–106. 405 Md. at 431–32, 952 A.2d at 273. Similarly, in *Outmezguine*, we noted that other subsections of the same statute included explicit *mens rea* language when we concluded that "the Legislature deliberately and purposefully chose not to make knowledge of the child's age an element of the crime [of unlawfully photographing a minor engaged in sexual conduct]." 335 Md. at 43–45, 641 A.2d at 882 (footnote omitted). Finally, in *Garnett*, we concluded that the fact that "Section 463(a)(3) prohibiting sexual intercourse with underage persons makes no reference to the actor's knowledge, belief, or other state of mind . . . results from legislative design" and is a strict liability offense. 332 Md. at 584–85, 632 A.2d at 803–04. In reaching that conclusion we stated both: (1) that another subsection of the same statute required the State to prove the offender knew or should reasonably know they were committing a different offense; and (2) that the legislative history indicated that "the Legislature explicitly raised, considered, and then explicitly jettisoned any notion of a *mens rea* element with respect to the complainant's age in enacting the law that formed the basis of [the underlying offense]." 332 Md. at 585–87, 632 A.2d at 804–05.

In the present case, the State has not persuaded this Court that language in the larger statutory scheme or the legislative history of the law indicates an intention by the General Assembly for a violation of NR § 4–1006.1 to be treated as a strict liability offense. First, within the same statute, there are no other offenses listed, and thus there are no offenses that explicitly feature *mens rea* language. And, while within the same subtitle of the Maryland Code as NR § 4–1006.1, numerous provisions prohibit certain activities related to harvesting clams and oysters, such as NR §§ 4–1004, 1006, 1007, and 1008, none of these prohibitions include any language imposing a *mens rea* requirement. Looking at the legislative history of the law, there is no indication that the General

Assembly "explicitly raised, considered, and then explicitly jettisoned any notion of a *mens rea* element," *Garnett*, 332 Md. at 587, 632 A.2d at 805, or in any other way indicated that it intended the law to be a strict liability offense. In light of the fact that "our own cases" have "articulate[d] the universal and persistent policy favoring a mens rea component for criminal liability" when "interpret[ing] . . . state or federal criminal statutes," *Owens*, 352 Md. at 676, 724 A.2d at 49–50 (quotations omitted), the lack of evidence indicating legislative intent to impose strict liability counsels against reaching such a conclusion.

Furthermore, other factors that courts consider when determining whether to interpret a law as imposing strict liability indicate that a violation of NR § 4–1006.1 should not be read as a strict liability offense. Among the factors a court considers, other than the legislative history of the law or the text of other related statutes, are the "severity of the punishment provided for the crime[,]" and "[t]he defendant's opportunity to ascertain the true facts [giving rise to the offense.]" Wayne R. LaFave, *Criminal Law* 290–92 (5th ed.2010). Both of these factors indicate that a violation of NR § 4–1006.1 is not a strict liability offense.

"Other things being equal, the greater the possible punishment, the more likely some fault is required; and conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault." Wayne R. LaFave, *Criminal Law* 291; *see also Dawkins*, 313 Md. at 644, 547 A.2d at 1044 (citation omitted) (noting that strict liability "public welfare" offenses "commonly involve light fines or penalties"). The severity of the punishment for a violation of NR § 4–1006.1 indicates that the offense should not be interpreted as a strict liability offense. The punishment for the first violation of a law within Title 4 of the Natural Resources Article, including NR § 4–1006.1, is "a fine not exceeding $1,000[.]" NR § 4–1201(a) (1973, 2005 Repl. Vol., 2011 Cum.Supp.). A second or subsequent violation of any law within Title 4 of the Natural Resources Article within a two-year period carries a potential "fine not exceeding

$2,000, or imprisonment not exceeding one year, or both[.]" NR § 4–1201(b) (1973, 2005 Repl.Vol., 2011 Cum.Supp.).[11]

When we concluded that the underlying offense in *Jordan* was a strict liability offense, we noted that the sanction offenders faced was "a monetary fine . . . not incarceration[.]" 405 Md. at 433, 952 A.2d at 274. When determining that the offenses at issue in *Dawkins* and *McCallum* were not strict liability offenses, on the other hand, we observed in both cases that an offender faced possible incarceration. *See McCallum,* 321 Md. at 457, 583 A.2d at 253; *Dawkins,* 313 Md. at 651, 547 A.2d at 1047. While the penalty for an initial violation of NR § 4–1006.1 does not carry the potential for incarceration, because a second violation of NR § 4–1006.1 or any of the provisions in Title 4 of the Natural Resources Article within a two-year period does carry the potential for incarceration, the severity of the punishment provided weighs against interpreting a violation of NR § 4–1006.1 to be a strict liability offense.[12]

Furthermore, a "defendant's opportunity to ascertain the true facts is yet another factor that may be important in determining whether the legislature really meant to impose liability on one who was without fault because he lacked knowledge of these facts." Wayne R. LaFave, *Criminal Law* 291–92; *see also Dawkins,* 313 Md. at 645, 547 A.2d at 1044 (citation omitted) ("While liability is imposed regardless of the defendant's state of mind, the defendant is generally in a position to prevent the violation from occurring."). In *McCallum,* this Court concluded that when prosecuting Mr. McCallum for driving with a suspended license, he was entitled to a

---

11. A violation of NR § 4–1006.1 also carries the potential for administrative penalties, including a suspension of the offender's fishing license for between thirty days and one year, or the revocation of a commercial fishing license. *See* COMAR 08.02.13.02; COMAR 08.02.13.03.

12. As Judge Battaglia highlighted at oral argument, "ultimately there could be incarceration . . . . this isn't just money, this is a liberty issue. . . . And it seems to me that what you are arguing is that the person who potentially faces incarceration has greater responsibilities than the State that imposes the possibility of incarceration."

jury instruction that *mens rea* or criminal intent is a required element of the crime. 321 Md. at 457, 583 A.2d at 253. In reaching this conclusion we stated that "McCallum would have no reason to avoid driving and no reason to suspect that he was endangering the public by driving if he had no knowledge that his driving privileges were suspended." 321 Md. at 457, 583 A.2d at 253. Similarly, because commercial clamming with the use of an HCD, while regulated, is not, in general, an illegal activity for licensed clammers, unless DNR provided the required notice that it was prohibited in that area, a licensed waterman would have no reason to avoid using an HCD. *See* NR §§ 4–1003 ("Any resident of the State may catch oysters or clams on any area in the waters of the State from which catching oysters or clams is permitted under the provisions of this subtitle.... This section applies ... to catching clams by hydraulic or mechanical dredges or rigs permitted by law for the particular area."); 4–1004 (requiring a license to engage in commercial clamming); *see also* NR § 4–1005 (stating that in general "a person may catch ... clams in waters of the State only by ... dredges ...").

Counsel for the State noted at oral argument, before this Court, that SAV zones are delineated "within the four walls of DNR" and can be changed at any time. NR §§ 4–1006.1(b) and 4–1006.1(d) require DNR to make adjustments to the SAV zones. NR § 4–1006.1(e)(2) allows DNR to "make revisions to the delineations of SAV protection zones at any time if determined to be necessary[.]" Because of the potentially ever-changing locations and borders of SAV zones, unless DNR meets its obligations to publish the specific locations of the zones, it would be very difficult for a waterman to know where he or she could conduct the otherwise lawful activity.

We are persuaded that the General Assembly did not intend for a violation of NR § 4–1006.1 to constitute a strict liability offense.[13] Additionally, the language of the statute as a whole indicates that a violation and subsequent

---

**13.** NR § 4–1006.1(c) is specific in directing DNR on how to give fair warning of SAV zones. We find a prosecution for violating NR § 4–

prosecution for violating NR § 4–1006.1 requires DNR to have fulfilled its obligations pursuant to NR § 4–1006.1(e)(3). Assuming *arguendo* that NR § 4–1006.1 read as a whole, or subsection (f) read alone, creates an ambiguity, alternatively, we would apply the rule of lenity and construe the statute in favor of Lowery. As we said recently:

> When other avenues of statutory interpretation fail to resolve an ambiguity, the rule of lenity comes into play. This ultimately means that statutes are strictly construed in favor of the accused. In a situation such as this, where contrary interpretations of the statute are possible, we must err on the side of the accused.

*State v. Weems*, 429 Md. 329, 344–45, 55 A.3d 921, 930 (2012); *see also Moore v. State*, 388 Md. 623, 632, 882 A.2d 256, 261

---

1006.1 analogous to a prosecution for a criminal trespass. Criminal liability may be established by proof of actual or constructive knowledge. In the present case, constructive knowledge could have been proven by establishing that DNR provided the notice specifically required by subsections (e)(1) and (e)(3). "The knowledge requirement is designed primarily to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain" in a prohibited area. *See Warfield v. State*, 315 Md. 474, 499, 554 A.2d 1238, 1250 (1989) (quotation omitted). The Natural Resources statute at issue in the present case, not unlike most criminal trespass statutes, requires "some awareness of lack of authority, license, privilege, invitation, or legality" on the part of the HCD user. *See Warfield*, 315 Md. at 499, 554 A.2d at 1250–51.

In *Warfield v. State*, we stated that "[t]he common requirement of criminal trespass offenses is that the actor be aware of the fact that he [or she] is making an unwarranted intrusion[,]" and cited to the Model Penal Code for the proposition that the offender shall have "an affirmative defense to prosecution for criminal trespass if the actor reasonably believed that the owner of the premises . . . would have licensed him to enter. . . ." 315 Md. at 498–99, 554 A.2d at 1250 (quotations and citations omitted). We noted that the "defense is available if the actor's belief is reasonable, that is, a belief which the actor is not reckless or negligent in holding." 315 Md. at 499, 554 A.2d at 1250 (citations omitted).

Similarly, a person charged with violating NR § 4–1006.1 should have the opportunity to present an affirmative defense that the person reasonably believed that he or she had permission to use an HCD, or other prohibited equipment, in the area where he or she was operating the equipment.

(2005) (quotation omitted) ("[C]riminal statutes must be strictly construed in favor of the defendant to prevent courts from extending punishment to cases not plainly within the language of the statute."); *Gardner v. State,* 344 Md. 642, 651, 689 A.2d 610, 614 (1997) (citations omitted) ("An ambiguous penal statute is subject to the 'rule of lenity,' which requires that such statutes be strictly construed against the State and in favor of the defendant.").

### III. Conclusion

In the present case, the State failed to prove that DNR complied with NR § 4–1006.1(e)(3). We are persuaded that a violation NR § 4–1006.1 is not a strict liability crime. Furthermore, in order to give meaning to NR § 4–1006.1(e)(3)'s mandate that DNR publish delineations and revisions of SAV zones, a prosecution for using an HCD in an SAV zone can only be maintained if the State establishes that DNR complied with NR § 4–1006.1(e)(3). Therefore, we conclude that because the State did not establish that DNR complied with NR § 4–1006.1(e)(3) Lowery's conviction for violating NR § 4–1006.1 cannot stand.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY REVERSED. DORCHESTER COUNTY TO PAY THE COSTS.**

HARRELL, BARBERA, and McDONALD, JJ., dissent.

McDONALD, J., dissenting, in which HARRELL and BARBERA, JJ., join.

The Petitioner, Edward Lowery, is in the business of harvesting clams from the bottom of the public waters of the Chesapeake Bay. The law regulates that trade closely, in part because some methods of harvesting—such as that used by Mr. Lowery in this case—rely on a hydraulic dredge to blast the bottom of the Bay, thereby destroying submerged aquatic vegetation ("SAV") and threatening the balance of the Bay's

ecosystem.[1] The Legislature has made SAV zones off limits to that method of harvesting, with transgressions subject to the general penalties provided for any basic violation of the State fisheries law.[2] The Legislature has further directed the Department of Natural Resources ("DNR") to delineate those zones and to publish those delineations "by public notice."

In this case, the District Court and Circuit Court both concluded that Mr. Lowery used a hydraulic clam dredge in a protected SAV area in violation of the State fisheries law. As the Court's opinion notes,[3] Mr. Lowery apparently did not contest that determination, but sought reversal on the ground that DNR failed to carry out the direction in Maryland Code, Natural Resources Article ("NR"), § 4–1006.1(e)(3), to "publish, by public notice, delineations of [submerged aquatic vegetation ("SAV") ] protection zones and revisions to SAV protection zones," when it placed public notices of the designation of those zones, and of the availability of greater detail from DNR, in *The Baltimore Sun* and the *Waterman's Gazette*.

The majority opinion concludes that, because DNR's public notices identified the areas containing SAV zones [4] (and where to obtain maps and precise coordinates) but did not include the map or precise coordinates in the public notices themselves, DNR failed to comply with the publication provision, that

1. The Legislature undertook to regulate the use of hydraulic clam dredges in SAV areas after the Atlantic States Marine Fisheries Commission "called for the protection of SAV because of its fundamental importance to many valuable fisheries." Environmental Matters Committee, Bill Analysis of Senate Bill 398 (April 1, 1998). The Department of Natural Resources had advised that "the use of hydraulic clam dredges destroys SAV by literally uprooting it from the bottom sediment layer." *Id.* Virginia had prohibited the use of the dredges for that reason. *Id.*

2. Maryland Code, Natural Resources Article, § 1–801 ("prepayable" fines); § 4–1201 (penalties for violation of State fisheries law).

3. Majority Op. at pp. 786–87, 61 A.3d at 799–800.

4. The record indicates that the public notices specifically identified Cook's Point Cove, where Mr. Lowery was using a hydraulic dredge, as one of the areas with a protected SAV zone.

proof of compliance with the publication provision is an *element* of an action to enforce the SAV protection law, and that, as a result, the State may not enforce the prohibition against the use of dredges, as well as certain other equipment, by commercial fishermen in SAV zones. In my view, those conclusions are mistaken.

*The Publication Requirement*

I disagree with the majority's construction of the publication requirement in NR § 4–1006.1(e)(3) for three reasons.

*Statutory Text*

First, the statute states that DNR is to publish its SAV delineations "by public notice," a phrase that the majority opinion quotes but does not discuss. That phrase is no stranger to the Maryland Code. A brief Lexis survey of the Code turns up numerous instances in which a State agency is obliged to provide "public notice" of a lengthy or detailed proposal, decision, or other document.[5] As best I can determine, none of those provisions contemplate that the entire proposal, decision, or document would appear verbatim in the "public notice." If we assume that the General Assembly is consistent in its use of language,[6] it is reasonable to conclude that it was not mandating that the coordinates for every SAV zone in the State be printed in DNR's public notice concerning the adoption or revision of SAV delineations.

---

**5.** *E.g.*, Maryland Code, Environment Article, § 15–205 (Department of the Environment to publish public notice of receipt of coal mining and reclamation plan); State Finance & Procurement Article, § 13–103(c) (agency to provide public notice of invitation to bid for agency contract).

**6.** The majority opinion suggests that we should not consult other statutes in which the phrase "public notice" appears in order to determine its plain meaning here. Majority Op. at p. 489 n. 5, 61 A.3d at 801 n. 5. However, reference to the General Assembly's use of the same phrase in other instances seems preferable to ignoring the phrase. *See Hastings v. PNC Bank, N.A.*, 429 Md. 5, 36, 54 A.3d 714 (2012) ("we do not ... delete words from an unambiguous statute ..."); *Smack v. DHMH*, 378 Md. 298, 305, 835 A.2d 1175 (2003) ("Words may not be ... removed from, an unambiguous statute ...").

*Legislative History*

Second, nothing in the legislative history of the SAV protection law suggests that a public notice concerning the delineation or revision of SAV zones was itself to contain the a map or the precise coordinates of all of those zones.

The prohibition against using a hydraulic clam dredge in an SAV zone was originally enacted as an emergency measure "necessary for the immediate preservation of the public health and safety" in 1998. Chapter 385, Laws of Maryland 1998. In addition to that prohibition, set forth in subsection (a) of the newly enacted NR § 4–1006.1, the statute directed DNR to delineate SAV beds "not currently protected" under the law by using aerial surveys as guidance. NR § 4–1006.1(b) (1998). Finally, the statute reserved the authority of DNR to take any other measures necessary to protect SAV zones. NR § 4–1006.1(c) (1998).

Within a short time, DNR found the directives of the SAV protection law difficult to implement. DNR believed that watermen might have difficulty complying with the existing prohibition because the existing delineations precisely tracked the areas of submerged vegetation without necessarily relating to geographic reference points and were changing annually based on the annual aerial surveys. *See* DNR Position Paper on Senate Bill 807 (2000).

In 2000, DNR supported proposed legislation to modify the statute in a number of respects. Under the proposed legislation, DNR would update SAV zones only once every three years instead of annually; DNR would be permitted to designate SAV zones "utilizing straight lines and existing points of reference" to make them more geographically manageable, even if, as a result, the designated zones excluded some areas with vegetation and included some areas without vegetation; DNR would use buoys and other visible landmarks to mark the zones and publish "by public notice" the delineations and revisions; and the list of prohibited equipment would be

expanded. Senate Bill 807 (2000).[7] While the 2000 bill itself did not pass,[8] the same proposal was eventually enacted two years later. Chapter 527, Laws of Maryland 2002.

Thus, it appears that the primary purpose of the 2002 amendment of NR § 4–1006.1 was to delineate SAV zones less precisely but more practically from the waterman's point of view, together with the use of buoys and other geographical references, and to change them less frequently. No mention was made in the legislative history of a need to better publicize the zones, though it seems likely that the elimination of annual updating would make a public notice of a revision, whenever it occurred, useful to the industry. In my view, the likely explanation for the addition of a public notice provision was the fact that SAV zones would no longer be revised on an annual basis, but less regularly, and that it would be helpful to alert the regulated industry when changes actually occurred.[9]

*Comparison to Analogous Publication Requirements*

Finally, there is nothing odd or unusual in the use of a public notice provision to notify a regulated industry of an agency's adoption of detailed standards or requirements that are not reprinted in their entirety in the notice, but readily

7. In testimony before the Legislature, the Chesapeake Bay Commission, an entity created by a multi-state compact to encourage proper management of the Bay's resources (see NR § 8–301 *et seq.*), promoted the bill for these reasons.

8. The 2000 bill did not pass the House. Identical legislation was reintroduced in 2001 and 2002. Senate Bill 172 (2001); House Bill 100 (2001); Senate Bill 195 (2002); House Bill 536 (2002). DNR provided the same explanation and support for the proposed changes as to each of these bills as it had in 2000. The bill failed to pass the House again in 2001, but ultimately passed both houses in 2002.

9. I acknowledge that this explanation for the public notice provision does not appear in the legislative history. Neither does any other explanation. But this ascribes a less radical intent to the Legislature than the majority's inference that the General Assembly intended to suspend enforcement of the SAV protection law—which had been on the books for a number of years and was originally passed as an emergency measure—contingent on a public notice containing unspecified details of the SAV delineations.

available from the agency. The law places analogous limitations on numerous occupations—from plumbers to commercial vehicle drivers, to name but two—to ensure public safety or to preserve the environment and those limitations are often not published in their entirety in a newspaper.[10]

Even if NR § 4–1006.1 were construed to require publication analogous to that required by the State Administrative Procedure Act ("APA")[11] for an agency to adopt a regulation, DNR's effort here would still be satisfactory. The APA's publication requirements are met by publication in the Maryland Register—in some instances, by a statement that does not set forth the detailed regulatory requirements itself, but incorporates by reference a document that, due to length or other reasons, is not reprinted in its entirety but maintained for consultation elsewhere.[12] If DNR's SAV delineations had been treated as a regulation under the State APA, the notice of the SAV delineations would not have appeared in a publica-

---

**10.** For example, the State has adopted a State plumbing code, which regulates the practice of plumbing in Maryland, as a formal regulation. The effectiveness of that regulation was contingent on completion of various steps set forth in the State APA, including that the regulation, both as proposed and as adopted, be published. That publication requirement was fulfilled by a notice that the State Board of Plumbing had adopted the code—which may be readily obtained elsewhere— without reprinting the entire code as part of that publication. In the latest iteration of the plumbing code, codified at COMAR 09.20.01, the APA publication requirement was satisfied by publishing in the Maryland Register a statement incorporating updated versions of the codes that had previously been similarly incorporated into COMAR by reference. *See* 36:3 Md. Reg. 234–36 (1/30/09) (proposed regulation); 36:10 Md. Reg. 716 (5/18/09) (final regulation).

A plumber who wished to consult some part of the State plumbing code—and who is subject to a criminal penalty for some violations of the code (*see* Maryland Code, Business Occupations & Professions Article, §§ 12–605, 12–607(b))—would not be able to find it in the official public notice of the adoption of the code. Rather, the code is available in various locations throughout the state, as well as others undoubtedly even more accessible to those in the trade.

**11.** Maryland Code, State Government Article ("SG"), § 10–101 *et seq.*

**12.** *See* SG § 7–207(a)(4); *see also* Division of State Documents, Incorporation by Reference Manual (July 2009) available at <*www.dsd.state. md.us/MDRegister/IBRManual.pdf* >.

tion as broadly circulated as *The Baltimore Sun* or as appropriately targeted as the *Waterman's Gazette;* rather, they would have been published in the Maryland Register, which has a largely legal and governmental readership. And the specific delineations themselves might well have been incorporated by reference, with maps and precise coordinates available for consultation at designated locations.

*Relationship of the Publication Requirement to Enforcement of the Prohibition*

The majority opinion states that proof that the publication provision of NR § 4–1006.1 has been satisfied is an element of an action to enforce SAV protection law.[13] But it is not clear from the majority opinion what DNR must do to satisfy that element. Under the Court's decision today, a public notice in a general newspaper and trade publication that identifies the locations with SAV zones and indicates where one may obtain a map or precise coordinates does not suffice. Even a public notice that itself has precise coordinates or maps may not suffice.[14] The majority opinion concludes that posting SAV delineations on the agency website would satisfy the publication requirement,[15] although the statute itself makes no reference to the Internet.

In any event, nothing in NR § 4–1006.1 makes a specific form of publication of the SAV zones a prerequisite to citing a person for operating a hydraulic dredge in such a zone. This is in contrast to the State APA, which specifically makes the validity of a regulation—and its enforcement[16]—contingent on

---

**13.** Majority Op. at pp. 481, 496–97, 61 A.3d at 796–97, 805–06.

**14.** *See* Majority Op. at p. 495 n. 10, 61 A.3d at 805 n. 10 ("we need not, and do not, determine if publishing delineations and revisions of SAV zones for one day in the Baltimore Sun Paper and in one edition of the Waterman's Gazette satisfied DNR's obligations . . .")

**15.** *See* Majority Op. at p. 494 n. 8, 61 A.3d at 804 n. 8.

**16.** Under the APA, an agency may not adopt a non-emergency regulation without first fulfilling certain notice and publication requirements. SG § 10–111(a). A failure to comply with the APA requirements

compliance with procedures that include publication of both the proposed and final version of the regulation in the Maryland Register.[17]

In NR § 4–1006.1, the public notice requirement is perhaps best understood as a means to alert the regulated industry that the existing delineations, some of which have been in effect since 1998, have been redrawn or that new ones have been created pursuant to the statute. But the public notice is not itself intended as a traffic control device—in contrast to the buoys and other on-site markings mentioned in the statute.[18] The availability of detailed charts at the same agency from which an individual must obtain a commercial clamming license would resolve any concerns that the publication provided fair notice to the regulated industry.

*Mens Rea Analysis*

Compliance with laws designed to protect natural resources is sometimes encouraged by the creation of strict liability offenses related to violations of those laws. The federal Migratory Bird Treaty Act is a familiar local example. *See* 16 U.S.C. § 703 *et seq.; United States v. Tarmon,* 227 F.Supp. 480, 482 (D.Md.1964) (citing reported cases and referring to "scores of unreported cases in this Court" for the proposition that scienter need not be proved). The majority opinion

---

renders the regulation ineffective. *See Evans v. State,* 396 Md. 256, 344–45, 914 A.2d 25 (2006).

**17.** Given that the SAV delineations may fit the definition of "regulation" under the State APA, SG § 10–101(g), there is an argument that DNR should have complied with the APA procedures in adopting them. However, Mr. Lowery has not asserted that the delineations are defective for lack of compliance with the APA and neither party has briefed the issue. Accordingly, I do not address that question any further other than to suggest that, if this decision prompts the State to re-adopt the SAV delineations, it may wish to consider whether or not that process should also follow APA procedures.

**18.** One might argue that adequate on-site markings are a prerequisite to an enforcement action, as Mr. Lowery's counsel argued in the trial courts. However, that is not the question before us. We granted certiorari on the question of DNR's compliance with the publication provision.

concludes that the SAV protection law is not such a law, despite the absence of a specific knowledge requirement in the statute.

Even if one finds the publication technically deficient in some way, that should not render Mr. Lowery—or others like him who have been caught using a dredge in an SAV zone—immune from enforcement of this important regulatory prohibition. Mr. Lowery was not operating a hydraulic clam dredge inadvertently and it seems a safe presumption that a commercial clammer is aware that use of that equipment is banned from SAV zones in the same way that a commercial truck driver is aware that some thoroughfares are off-limits to trucks and that there are reduced speed zones around schools even without prior publication of the precise location of every public school.[19] In such circumstances, "[t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Morissette v. United States*, 342 U.S. 246, 255, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

This is hardly an unfair presumption in this case. The ban on the use of hydraulic dredges in SAV zones is no secret—it had been in place for more than 13 years at the time of Mr. Lowery's offense. During that period, according to the record in this case, Mr. Lowery had obtained from DNR more than 50 commercial fishing licenses of various types and had previously purchased charts from the same official who stood ready to make available charts of the SAV delineations. While the defense focused on the means by which DNR attempted to satisfy the statutory publication requirement and the adequa-

---

**19.** When an individual engages in a regulated trade or business, this Court has not accepted excuses based on alleged ignorance of the law. "(J)ust as a motorist is presumed to know the law relating to motor vehicles, so too is a landlord presumed to know the requirements of the City Code pertaining to the habitability of leased premises. In either case, it is the actions and omissions that have the legal effect the law prescribes, and thus must be evaluated, not the actor's knowledge or ignorance." *Benik v. Hatcher*, 358 Md. 507, 532, 750 A.2d 10 (2000) (Bell, C.J.) (citations omitted).

cy of the signs and buoys that marked the SAV zone involved in this case, Mr. Lowery's counsel did not explicitly assert that Mr. Lowery himself was ignorant of the requirements governing his regulated profession.

In the end, the majority opinion would require proof of "actual or constructive knowledge" to establish a violation of the SAV protection law and would allow an affirmative defense that an individual using banned equipment in an SAV zone had a reasonable belief that the activity was permitted.[20] However, even if one imputes such a knowledge requirement into the statute, it is quite another thing to hold that proof of publication is an element of an enforcement action and that DNR's failure to include all details concerning SAV zones in its public notice effectively negates any other proof of the requisite intent.

*Conclusion*

Transparency in government is a good thing. To that end, it is hoped that DNR will follow its counsel's advice, promised at oral argument and noted in the Court's opinion, that it post its SAV delineations on the agency's website, where they will be readily available to all. But its failure to do so to date is not a basis on which to decide this case. In my view, DNR adequately complied with the publication requirement but, even if it were somehow technically deficient, that should not absolve Mr. Lowery from compliance with the SAV protection law. Thus, I would affirm the judgment of the trial court.

Judge HARRELL and Judge BARBERA join in this opinion.

---

20. Majority Op. at pp. 503–04 n. 13, 61 A.3d at 810 n. 13.