*Shawn Alexander v. State of Maryland*, **No. 0818 of the September 2023 Term, Opinion by Moylan, J.**

**HEADNOTE:**

TWO LONG-TERM PROLIFERATIONS – THE BURGLARY COUNTS – THE THEFT-RELATED COUNTS – THE SENTENCING – MOTION TO CORRECT AN ILLEGAL SENTENCE – A VERY DIFFERENT LITIGATIONAL ATMOSPHERE – THE GRANTING OF LEAVE TO FILE A BELATED APPEAL – SUBSECTION 6-205(F): A BIT OF AN ODDITY – THE SAME EVIDENTIARY PREDICATE OR NOT THE SAME? – CONVICTIONS VERSUS GUILTY PLEAS: HISTORIC FACTS VERSUS PROFFERS – AN OMNIBUS PROFFER - THE INHERENT AMBIGUITY OF AN OMNIBUS PROFFER – IDENTIFYING THE PROBLEM – STATUTORY INTERPRETATION: THE VERB PHRASE "BASED ON" AND THE PARTICIPLE "ESTABLISHING" - CONSTRUING THE MEANING OF THE STATUTE: THE "ACT" IS THE "EVIDENTIARY PREDICATE" – WHAT IS THE EVIDENTIARY PREDICATE WE MEASURE? THAT OF A "CLIFFHANGER" OR THAT OF A "SLAM DUNK" – THE STATE'S ARGUMENT: COMPARING TWO FLOATING DEFINITIONS – STATUTORY INTERPRETATION: STAGE ONE: THE STATUTE WILL BE LIBERALLY INTERPRETED – THE LEGISLATIVE BACK STORY: THE COMMITTEE TO REVISE THE CRIMINAL LAW – A MILIEU OF UNCERTAINTY: A LITIGATIONAL KISS OF DEATH – A REDUNDANT TIEBREAKER: THE RULE OF LENITY – THREE HYPOTHETICAL EVIDENTIARY PREDICATES – AN

**INCONSEQUENTIAL WRINKLE – OUR HOLDING – A WISTFUL AFTERTHOUGHT**

Circuit Court for Wicomico County
Case No. C-22-CR-21-000316

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0818

September Term, 2023

_____

SHAWN ALEXANDER

v.

STATE OF MARYLAND

_____

Shaw,
Tang,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: October 9, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The subject of this appeal is an isolated little gem of criminal procedure found at Criminal Law Article, Subsection 6-205(f). It is a small aspect of fourth-degree burglary. It is a low-profile limitation on a conviction for just one of the four modalities of fourth-degree burglary, to wit, on a conviction for Subsection 6-205(c). It applies to absolutely nothing else. It comes before us, moreover, as a matter of first impression. The better to understand this small nugget of criminal procedure, the more prudent it is initially not to get too close but to stand far back. A thousand years far back.

## Two Long-Term Proliferations

In the beginning, there was Burglary. Centuries before Columbus discovered America, Burglary was already ensconced as one of the Common Law's nine archetypical felonies.[1] It forbade the breaking and entering of the dwelling house of another in the nighttime in order to commit a felony therein. Over long intervening centuries, the multitudinous tweaking and modifying of Burglary's archetypical <u>actus</u> <u>reus</u> compounded by the multitudinous tweaking and modifying of Burglary's archetypical <u>mens</u> <u>rea</u> has produced an extended family of Burglary-related offenses that today constitutes a small but significant criminal code in its own right. *See* Title 6, Subtitle 2, "Burglary and Related Crime." There have been dozens upon dozens of such tweaks. It took a long time for

---

[1] As the treasured mnemonic device of MR. & MRS. LAMB reassuringly reminds us, the Common Law's nine original felonies were Murder, Rape, Manslaughter, Robbery, Sodomy, Larceny, Arson, Mayhem, and, as not the least of these, Burglary. To bring the subject even closer to home, Burglary, with whatever bumps and bruises it had suffered or enjoyed as of 1634 – several centuries of small accretions, modest deletions, and nuanced distinctions – crossed the Atlantic as part of the unseen cargo of the Ark and the Dove. English colonists brought with them their Common Law, even if they were themselves unaware of having done any such momentous a thing.

common law Burglary to proliferate into, <u>inter</u> <u>alia</u>, four distinct varieties of burglary in the fourth-degree. We will be dealing on this appeal with one of those distinct varieties of fourth-degree burglary, a far-flung spin-off from the archetypical common law original.

Just as Common Law Burglary proliferated into a small family of burglary-related offenses, so too did Common Law Larceny proliferate into a modest criminal code of its own. *See* Title 7, "Theft and Related Crime." To what extent, we must now ask, do some of these far-flung spin-offs duplicate each other and thereby foreclose each other? *See* C. Moylan, "The Historical Intertwining of Maryland's Burglary and Larceny Laws or the Singular Adventure of the Misunderstood Indictment Clerk," 4 U. of B. L. Rev. 28 (1974).

The centuries of proliferation inevitably generated the problem that is now before us. Has there now come a time when some far-flung spin-off from the burglary-related family of offenses so closely resembles some far-flung spin-off from the theft-related family of offenses that convictions for both might well constitute being placed twice in jeopardy for the same offense?[2] At what point may a defendant convicted of fourth-degree burglary today interpose the ancient common law plea of <u>autrefois</u> <u>convict</u>? Subsection 6-205(f) provides a limited latter-day answer. Subsection 6-205(f), if asserted by a defendant, is precisely the ancient plea of <u>autrefois</u> <u>convict</u> but under one highly specific set of circumstances.

---

[2]     When we speak of the "same offense" or of "double jeopardy" in this opinion, we do so strictly within the context of subsection 6-205(f) and its definition of the problem to be avoided. We are not using the "same elements" test of <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S. Ct. 180, 76 L.Ed. 306 (1932).

## The Burglary Counts

A criminal information in five counts was filed against the appellant, Shawn Alexander, in the Circuit Court for Wicomico County. The first three counts were all from the burglary-related family of charges. The first count charged first-degree burglary in violation of Sect. 6-202. The second count charged third-degree burglary in violation of Sect. 6-204. As a result of a plea bargaining agreement followed by the appellant's plea of guilty to the third count, those first two counts were Nol Prossed by the State and are no longer before us. It is only Count Three that concerns us.

Count Three, to which the appellant entered the plea of guilty, was also from the burglary-related family of offenses. The charge was one of fourth-degree burglary in violation of subsection 6-205(c). Of the four modalities of fourth-degree burglary prescribed by Sect. 6-205, subsection 6-205(c) specifically proscribes:

> (c) Prohibited – Being in or on dwelling, storehouse, or environs. – <u>A person, with the intent to commit theft</u>, <u>may not be in or on</u>:
>
>> (1) the dwelling or storehouse of another; or
>> (2) a yard, garden, or other area belonging to the dwelling or storehouse of another.

(Emphasis supplied.)

In terms of its <u>actus</u> <u>reus</u>, subsection (c) is less demanding physically than the other varieties of fourth-degree burglary respectively proscribed by subsections (a), (b), and (d). Subsection (a) requires an actual <u>breaking and entering</u> of the dwelling of another and subsection (b) requires an actual <u>breaking and entering</u> of the storehouse of another. Subsection (d) charges the <u>possession of burglar's tools</u>. Subsection (c), by far tamer

3

contrast, proscribes merely being "in or on" the dwelling or storehouse of another or even being "in or on" a yard, garden, or other area belonging to the dwelling or storehouse of another without regard to how one got there. No breaking or entering is required nor is the possession of burglar's tools required. The <u>actus</u> <u>reus</u> of fourth-degree burglary charged in subsection 6-205(c) need not physically, in and of itself, be criminal behavior.

If, however, subsection 6-205(c) tenders a lighter touch with respect to its <u>actus</u> <u>reus</u>, it is more heavy-handed in terms of its <u>mens</u> <u>rea</u>. Of the four modalities of fourth-degree burglary, subsection 6-205(c) is the only one that also demands "the intent to commit theft." That particular <u>mens</u> <u>rea</u> then is the latter-day tweak that may, for better or for worse, most likely interact with some latter-day provision from the theft-related family of offenses to create a double jeopardy concern. Subsection 6-205(c) is a burglarious <u>actus</u> <u>reus</u> with a larcenous <u>mens</u> <u>rea</u>, a textbook overlap. It is an overlap of burglary into the theft-related family of offenses. It is the only reason that subsection 6-205(f) even exists, a thousand years after the two proliferations of Burglary and Larceny began.

## The Theft-Related Counts

On that same criminal information filed against the appellant, both Counts Four and Five arose from the theft-related family of offenses. Each of those counts charged the appellant with stealing "personal property" "having a value of at least $1,500 but less than $25,000." The two counts were indistinguishable save only for the date of the charged offense. Count Four charged that the theft had occurred on June 7, 2021. Count Five charged the same offense but alleged that the offense occurred "between the dates of May 3, 2021 and June 7, 2021 pursuant to one scheme and contrary course of conduct."

4

The appellant entered a guilty plea to Count Five and the State entered a Nol Pros on Count Four. What remains before us then for analysis are Counts Three and Five, one from the burglary-related family of offenses and one from the theft-related family of offenses. Do they differ in name only?

## The Sentencing

It was on December 13, 2021, that the appellant entered his guilty pleas to both Counts Three and Five and that the State Nol Prossed the remaining counts. The State then offered a very full statement of supporting facts, proffering the evidence that it could offer to support both guilty pleas. The appellant made no objection and fully endorsed the State's proffer of evidence. The trial court ruled that the evidence was legally sufficient to support the guilty pleas and, accordingly, found the appellant guilty on both the third and fifth counts.

The sentencing of the appellant followed immediately. On Count Three, the fourth-degree burglary, the Court sentenced the appellant to a term of three years, suspending all but the time already served. On Count Five, the theft scheme pursuant to Criminal Law Article Sect. 7-104, the appellant was sentenced to a consecutive term of five years, all of it fully suspended. The appellant was placed on supervised probation for a period of five years along with mandatory participation in a substance abuse program and with the payment of restitution. With that, the sentencing hearing uneventfully adjourned.

## Motion To Correct An Illegal Sentence

For four months, the case remained quiet. On April 13, 2022, however, the appellant filed a Motion to Correct an Illegal Sentence pursuant to Maryland Rule of

5

Procedure 4-345. Several defensive efforts by the State to dodge that motion with a claim of non-preservation for appellate review are blocked by Rule 4-345's provision that a trial court may "correct an illegal sentence at any time." On May 12, 2022, the trial court denied the appellant's motion.

### A Very Different Litigational Atmosphere

As a result of that April 13, 2022 Motion to Correct an Illegal Sentence, the question of subsection 6-205(f)'s possible prohibition on the acceptance of the appellant's guilty plea to a fourth-degree burglary pursuant to subsection 6-205(c) is now before us. Ironically, this question, albeit a sentencing concern, would almost certainly not have arisen at the December 13, 2021 hearing at which the appellant's guilty pleas were initially entered and accepted and at which the sentences were imposed. This present issue, of course, could easily have arisen on that earlier sentencing date. Realistically, however, it would not have done so. Even if subsection 6-205(f) had been on the parties' radar screen on that earlier occasion, the appellant, in the warm afterglow of a mutually acceptable plea agreement, almost certainly would not have raised subsection 6-205(f) as an issue. Even had it somehow been raised, however, the State, in the same warm afterglow, almost certainly would not have opposed the application of subsection 6-205(f) to the case. What a difference in attitude four months can make! In any event, the issue is properly, even if belatedly, now before us and it needs to be resolved.

### The Granting Of Leave To File A Belated Appeal

There were several procedural complications in this case that need not now concern us. It was on May 12, 2022 that the court denied the appellant's Motion to Correct an Illegal

6

Sentence. On February 14, 2023, the appellant filed an Application for Leave to Appeal the denial of the Motion to Correct an Illegal Sentence. Five months later, on June 20, 2023, this Court granted that Application for Leave to Appeal, vacating the sentence originally imposed. Our granting of the Application for Leave to Appeal included the order "that the issue raised in the application for leave to appeal alleging the illegality of the burglary sentence be and hereby is transferred to the direct appeal docket." In any event, despite the attenuated procedural path by which this issue of the legality of the appellant's sentence for a fourth-degree burglary came to be before us, it is now before us.

## Subsection 6-205(f):
## A Bit Of An Oddity

In making his case for an illegal sentence, the appellant invokes subsection 6-205(f), which provides:

> (f) *Conviction of theft.* – A person who is convicted of violating § 7-104 of this article may not also be convicted of violating subsection (c) of this section based on the act establishing the violation of § 7-104 of this article.

(Emphasis supplied.)

This language is by no means as clear and simple as it may appear on first reading to be. A good starting point for analysis is the initial reaction of the hearing judge when she was first confronted with the Motion to Correct an Illegal Sentence:

> There's a pending motion to dismiss, which was very interesting and informative for me. I wasn't aware that there was a provision of the law that indicated that you couldn't be convicted of both fourth degree burglary and theft based upon the theft from the home[.]

That response well expresses our own initial surprise at what had theretofore been to us as well a completely new and unfamiliar problem. We can find no appellate opinion,

7

moreover, even dealing with, let alone analyzing, subsection 6-205(f). This miniscule wrinkle of fourth-degree burglary law is truly a <u>tabula</u> <u>rasa</u>. We are writing on a clean slate.

Subsection 6-205(f) is very much a late starter in Maryland law. It has been with us for a brief 30 years. What is now subsection 6-205(f) was taken without substantive change from Article 27, Sect. 32, subsection (e). That earlier provision had, in turn, been enacted in 1994 as part of an extensive revising and restructuring of the statutory laws governing burglary by chapter 712 of the Acts of 1994. Indeed, even fourth-degree burglary itself is very much of a late starter. As Judge Kenney pointed out for this Court in <u>Marquardt v. State</u>, 164 Md. App. 95, 150, 882 A.2d 900 (2005), "The original fourth degree burglary statute was enacted by the General Assembly through <u>Chapter 661 of the Laws of 1973</u>." Judge Kenney elaborated:

> It is apparent that the General Assembly enacted fourth degree burglary to punish the *actus reus* of breaking and entering the dwelling house of another without regard to *mens rea*, save that the violator must know the invasion is unauthorized.

164 Md. App. 151-52; *see also* <u>Dabney v. State</u>, 159 Md. App. 225, 235, 858 A.2d 1084 (2004); <u>Herd v. State</u>, 125 Md. App. 77, 87, 724 A.2d 693 (1999); <u>Bane v. State</u>, 73 Md. App. 135, 148-49, 533 A.2d 309 (1987).

Subsection 6-205(f) is an odd little provision. It is not an actual affirmative element of fourth-degree burglary. It does not define a crime. It is rather a constraint on a conviction for a fourth-degree burglary, but only in a narrowly limited way. Section 6-205, prescribing fourth-degree burglary, covers four distinct modalities for perpetrating the crime. The proscription of subsection 6-205(f), however, applies to only one of those four modalities.

8

It does not even speak to subsections 6-205(a), 6-205(b), or 6-205(d), let alone inhibit them. It is a limitation only on subsection 6-205(c). What is it then that makes subsection 6-205(c) uniquely vulnerable to this constraint?

The other three modalities of fourth-degree burglary, of course, involve behavior on the part of the defendant constituting a more sinister <u>actus</u> <u>reus</u>. Subsection (a) involves an actual <u>breaking and entering</u> of a dwelling house. Subsection (b) involves an actual <u>breaking and entering</u> of a storehouse. Subsection (d) involves the <u>possession of a burglar's tool</u>. Subsection (c), by contrast, involves no necessary criminal behavior of any sort. The defendant's presence "in or on" a dwelling or a storehouse or their environs may be completely permissible, indeed, innocuous. The physical component of subsection (c) involves physically nothing more sinister than mere presence in a particular place.

The criminal significance of subsection (c) inheres almost exclusively in its <u>mens</u> <u>rea</u> – in its "<u>intent to commit theft</u>." It is in this regard that this far-flung spin-off from the burglary-related family of offenses may overlap with the theft-related family of offenses. The restraining influence of subsection 6-205(f) focuses on that possible overlap. Subsection 6-205(f) is triggered by a consummated act of theft followed by a conviction. Subsection 6-205(c) requires a <u>mens</u> <u>rea</u> that consists exclusively of an "intent to commit theft." To what extent is subsection 6-205(c)'s <u>mens</u> <u>rea</u> subsumed within Section 7-104's arguably larger elements?

9

## The Same Evidentiary Predicate
## Or Not The Same?

The argument between the appellant and the State is a narrow one. Subsection 6-205(f) is a statutory provision obviously aimed at insuring a defendant's protection against double jeopardy. It provides that a defendant may not be convicted of the subsection 6-205(c) variety of fourth-degree burglary if the mens rea of an "intent to commit theft" on which such a verdict must necessarily be based is one and the same as the necessary elements required to establish the guilt of the appellant for the theft scheme for which he was convicted pursuant to Sect. 7-104 on Count Five. When we compare the act or acts on which the burglary conviction was based with the act or acts which established the theft conviction, we are not talking about actual elements of the respective crimes. We are talking about evidence to prove those respective elements. We must find that factual evidence, moreover, in the omnibus proffer of evidence recited by the State to support the guilty pleas. That is our evidentiary universe.

If they are factually the same, subsection 6-205(f) will preclude such a double conviction for the same offense. That is precisely what subsection 6-205(f) states. If, on the other hand, they are not factually the same, subsection 6-205(f) will not apply. We must make the comparison. We must compare the proof of the mens rea of Count Three with the proof of Count Five.

The appellant argues that the evidentiary proof of the two was one and the same and that double jeopardy, therefore, was involved. The State's argument, on the other hand, is that because the crime alleged in Count Five extended over a longer period of time than

10

did the crime alleged in Count Three, the proof of that crime necessarily required more evidence than did the proof of the <u>mens</u> <u>rea</u> of Count Three. Therefore, argues the State, the factual bases of the two crimes were not the same. The guilty plea on Count Three required less proof than was necessary to support the guilty plea on Count Five. If the evidentiary predicate for those two convictions were not the same, the prohibition against double jeopardy would not apply.

At the most fundamental level, what we are called upon to do is to compare two evidentiary or factual predicates. Was the evidentiary or factual predicate on which the conviction for the fourth-degree burglary (subsection 6-205(c)) was **<u>BASED</u>** the same as the evidentiary or factual predicate that **<u>ESTABLISHED</u>** the violation of the theft law (Sect. 7-104)?

### Convictions Versus Guilty Pleas: Historic Facts Versus Proffers

The procedure followed in the entering of the guilty pleas in this case aggravates the task of making such a comparison. Comparing two guilty pleas is not the same exercise as comparing two actual convictions. A conviction establishes historic facts; a proffer of evidence, on the other hand, only speculates about possibilities. In comparing the evidentiary or factual predicates for two actual convictions, we have the benefit of actual <u>factfinding</u>. A proffer of evidence produces soft factfinding, not hard factfinding.

Actual findings of fact, by a jury or by a judge, have been rigorously tested by the adversary process, and have then been found to exist as a matter of fact. In the process of taking a guilty plea, on the other hand, the qualifying process for the evidence is not nearly

11

so rigorous. The State is simply required to proffer those facts that it alleges it would be able to prove if the trial were actually to be held. By and large, the defense does not contest that proffer. What the trial judge then decides are not actual factfindings. The judge simply makes a legal ruling that if the proffer should be true, those proffered facts would be legally sufficient to support the guilty plea or pleas. Our base for asserting what the facts actually are is accordingly more slippery. Nothing is based on sworn testimony. At the most basic level, the very language at a guilty plea hearing is in the subjunctive rather than the indicative mood. ("If this should be the evidence, then it would be legally sufficient.") True factfinding, by contrast, is in the indicative mood. The legal ruling, moreover, does not establish that the facts proffered by the State are necessarily the sine qua non – the rock bottom minimum necessary to support the guilty plea. The evidentiary predicate that is ruled to be "enough" may well have been "more than enough," perhaps "far more than enough."

## An Omnibus Proffer

In the taking of the guilty pleas in this particular case, moreover, there was an additional layer of some uncertainty. Frequently we have the benefit of knowing at least what the State thinks it is offering as support for a guilty plea. In this case, by contrast, we simply have one omnibus collection of proffered evidence offered indiscriminately to support two separate guilty pleas. As opposed to a particularized proffer or two, we have one omnibus proffer. We simply do not know which particular supporting facts the State even thought it was offering to support which particular guilty plea. It was all one big

conglomeration of unsorted evidence that we are now being required to sort out into two separate parts.

Was all of the evidence, for instance, that the State proffered to support the guilty plea for the theft scheme charged in Count Five also proffered by the State to support the guilty plea to fourth-degree burglary charged in Count Three? Or did the State believe that much of the evidentiary support it proffered on Count Five was completely redundant as to Count Three and had nothing to do with Count Three? Or was it more likely the case that at the time, nobody was even thinking about it and nobody cared?

Were problems such as this to recur with any frequency in the future (they will not), it might require for each separate guilty plea that there be a separate and distinct proffer with respect to the evidence offered to support that particular plea and then a separate legal ruling as to the legal sufficiency of each particular proffer of evidence.

### The Inherent Ambiguity Of An Omnibus Proffer

The proffering of evidence is the offering of evidence for an assigned purpose. It is important, therefore, to know the purpose to which the proffered facts are being assigned. The omnibus proffer of a wide collection of facts in this case, however, left completely to chance the lesser included question of whether a particular proffered fact was being offered as a <u>basis</u> for the burglary conviction or to <u>establish</u> the theft conviction or to help prove both.

As they craft their respective arguments, the parties to the case do not hesitate to assign the purpose of every proffered fact. They readily take upon themselves the authority to assign a purpose to a proffer. Inevitably, the parties then assign the proffered facts for

13

far different purposes. At the most fundamental level, the very crux of our problem on this appeal is that the omnibus proffer failed to take its lesser included factual proffers and to sort them out into the two distinct categories that subsection 6-205(f) requires to be compared with each other. That sorting has been left to the lawyers and the lawyers, inevitably, do not sort the same way. The ultimate sorting has now been left to us.

This assignment of a purpose for each proffered fact is at the very core of the issue now before us for resolution. If, for instance, the complete omnibus proffer were being assigned, in its entirety, for the purpose of proving both the burglary and the theft, the forbidden condition defined by subsection 6-205(f) would be satisfied ipso facto and the case would be over. The body of evidence on which the burglary conviction was based would, proffered fact by proffered fact, be the same as the body of evidence that was proffered to establish the theft conviction.

Short of that, the proffered facts need to be sorted into separate and distinct categories. Our basic problem in this case is rooted in the inherent ambiguity of the omnibus proffer. An omnibus proffer can be a treacherous commodity. Both at the hearing on the motion to correct an illegal sentence and in appellate briefs, each party presumed to attribute to itself or to the other party particular purposes for particular proffered facts, But we are deaf to any such attributions. All we know or wish to know about the purpose of any proffered fact is what the court was told at the time of the omnibus proffer itself. At that moment, the time for the attributing of purposes was over.

In the simplest of terms, if the case to prove the fourth-degree burglary conviction were a weak and barely sufficient case, subsection 6-205(f) would probably not apply and

14

the State would prevail. If, on the other hand, the case to prove the fourth-degree burglary conviction were a very strong case, subsection 6-205(f) almost certainly would apply and the appellant would probably prevail. The task remaining before us on this appeal is to identify the rules determining whether the case proving the fourth-degree burglary conviction was a weak case or a strong case and then to apply those rules. We begin by looking at precisely what subsection 6-205(f) says.

## Identifying The Problem

In appellate litigation, it is frequently a more difficult challenge to identify the problem then it is to solve the problem. As we seek to identify the core problem in this case, we find that it is two-fold. There is first, in the very words of subsection 6-205(f) itself, the fluctuating meaning of the word "act." There is, then, as we search for that meaning, the agonizing ambiguity of the omnibus proffer. The risk of confusion is exponential. We must begin by reading the statute.

## Statutory Interpretation:
## The Verb Phrase "Based On" And The Participle "Establishing"

In this sorting process, what is it that subsection 6-205(f) asks us to do? Our first job is to determine exactly what subsection 6-205(f) says. A definitive statement of "Pertinent Principles of Sound Statutory Interpretation" was set out by Judge Harrell in <u>Lockshin v. Semsker</u>, 412 Md. 257, 274-77, 987 A.2d 18 (2010). The primary purpose is clear:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's <u>primary goal in interpreting statutory language is to discern the legislative purpose, the ends</u>

15

> to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction.

412 Md. at 274 (emphasis supplied and internal citations omitted); *see also* State v. Johnson, 415 Md. 413, 421-22, 2 A.3d 368 (2010).

The plain language of the statute tells us flatly what the precipitating event is for the application of the subsection 6-205(f) prohibition. It is a conviction for a violation of section 7-104, the basic theft law. The acceptance of the guilty plea on Count Five established that precipitating event irrefutably. What was then forbidden was not any subsequent conviction for a fourth-degree burglary pursuant to subsection 6-205(c) but only such a conviction if it was "based on the act establishing the violation of section 7-104." That phrase is our critical text.

We immediately scurry for the plain meaning of the verb phrase "based on" and of the participle "establishing." The dictionary meanings of those verb forms, however, do not really help us. We need nouns, not verbs. We need the nouns that propel those verbs. They are the "plain words" that are implicit rather than explicit. We need to compare the factual or evidentiary predicate on which the fourth-degree burglary conviction was based with the factual or evidentiary predicate that established the theft conviction and determine whether they are or are not the same. Before we can compare those evidentiary predicates, however, we must identify those factual or evidentiary predicates.

16

When all of the eloquent and fervid argument has quieted down, one simple question remains. Was the evidentiary predicate that the fourth-degree burglary conviction was "based on" the same as the evidentiary predicate that "established" the conviction for theft? Was the factual underpinning of THIS the same as the factual underpinning of THAT?

In comparing the respective evidentiary predicates, an immediate problem is that an evidentiary predicate is a fluid thing. Those evidentiary predicates must both take their substance, of course, from the reservoir of evidence recited by the State in its omnibus proffer of evidence. In selecting which facts from that omnibus collection of facts to argue, both parties, ideally, should use the same selection standard. It is one thing to compare the maximal evidentiary predicate for THIS with the maximal evidentiary predicate for THAT or to compare the minimal evidentiary predicate for THIS with the minimal evidentiary predicate for THAT or even, although this exercise is exasperatingly illusive, to compare the average evidentiary predicate of THIS with the average evidentiary predicate of THAT. The unforgiveable sin is to cherry-pick selected facts out of the omnibus reservoir of proffered facts to one's advantage. Those who cherry-pick inevitably end up comparing apples with oranges to no one's satisfaction but their own.

### Construing The Meaning Of The Statute: The "Act" Is The "Evidentiary Predicate"

As we pore over and attempt to decipher the meaning of the plain words of the statute, the epicenter of those words turns out to be the small three-letter word "act." Here is the noun we seem to have been groping for. It is a linking word stretching in two directions. It is the bridge connecting both sides of the comparison we are committed to

make. We must compare the "act" on which the burglary conviction was based with the "act" that established the theft conviction. What exactly was the "act?" This entire appeal revolves around the meaning (or meanings) of the word "act." Subsection 6-205(f) tells us the "act" was the thing on which the burglary conviction was based and that the "act" was also the thing that established the theft conviction. What subsection 6-205(f) fails to tell us is that the "act" is not always the same thing. It is a floating definition.

The problem is that there is no plain meaning of "act." The meaning is not at all plain. The word is fluid. It is flexible. It is a semantic shapeshifter that seldom so much as gives off a clue that the shape has shifted. It is both singular and plural with random unpredictability. In the context of subsection 6-205(f), the term "act" may stand, of course, for a single action. It may just as readily, indeed more readily, stand for a dozen actions, nay for a hundred actions, over the course of days or weeks or longer. It stands collectively for the entire body of proof for a particular conviction. It stands for all of the facts, for all of the evidence, for all of the actions that enter into that body of proof. The word is, therefore, a linguistic stumbling block that periodically requires explanation. Because the term can be treacherously confusing, however, it is awkward to have to use it and to explain it repeatedly in an extended analysis. It is walking a linguistic tightrope.

In order, therefore, to stress this fluidity, this flexibility, of the term "act," we will hereafter in this opinion use the term "evidentiary predicate" as a substitute. Whereas the word "act" might suggest a rigid singularity, the phrase "evidentiary predicate" more accurately reflects a diverse reality. The "evidentiary predicate" might refer to the proof of a weak though legally sufficient case. It might refer a variety of proofs in a variety of

average cases. It might refer to the abundant proof of an overwhelming case. It is anything but singular. In a subsection 6-205(f) analysis, the phrase "evidentiary predicate" is far less likely than the word "act" to lead our reasoning astray. The term "evidentiary predicate" has more flexibility. We will be comparing the "evidentiary predicate" on which the burglary conviction was based with the "evidentiary predicate" that established the theft conviction. The term "act" will not again appear (at least advertently) in this opinion.

### What Is The Evidentiary Predicate We Measure?
### That Of A "Cliffhanger" Or That Of A "Slam Dunk"

What then are the measurement or selection standards for the respective evidentiary predicates? We must look to subsection 6-205(f). That small statutory provision of criminal procedure squarely forbids a fourth-degree burglary conviction under subsection 6-205(c) that is "based on the act establishing the violation of" Section 7-104.

Each evidentiary predicate, of course, and each set of evidentiary predicates must be composed of the facts and evidence contained in the omnibus proffer of facts offered by the State to support the guilty pleas. But in comparing their respective sets of evidentiary predicates, how much of the material in that omnibus proffer of facts may the appellant and the State be permitted to use? Are there limits on how much they may use? How much may one take from that omnibus proffer? A little bit? Or a lot? The evidentiary predicate is flexible. The same precise conviction that is based on a smaller evidentiary predicate could also be supported by a larger evidentiary predicate. In such a case, which evidentiary predicate should we compare?

In this process of making comparisons, our very language can be treacherous. An evidentiary predicate, for instance, is seldom, if ever, a fixed amount. Even for the exact same conviction, the evidentiary predicate for a weak case is by no means the same as the evidentiary predicate for a strong case. An evidentiary predicate, therefore, can be a rollercoaster. Even to use the definite article "the" can frequently be misleading. The case of proof for a given conviction may have dozens of different evidentiary predicates. There is no fixed evidentiary predicate for **THE** case. Uncertainty is inherent.

The indispensable thing to remember about an evidentiary predicate is that it may be variable in its characteristics. It may be Doric; or it may Corinthian; but in either event, it is a supporting column. It is not for either party to presume to say that all supporting columns must be Doric or that all supporting columns must be Corinthian. As the stage is being set for subsection 6-205(f)'s required comparison, the State is content, of course, for the evidentiary predicate that <u>established</u> the theft conviction to be ornately Corinthian even while sternly insisting that the evidentiary predicate on which the burglary conviction was <u>based</u> be austerely Doric. Such a contrast, of course, supports its argument that the two evidentiary predicates (the two "acts") are not the same.

In comparing the <u>base</u> for the burglary conviction with that which <u>established</u> the theft conviction, each party will seek to manipulate the size of the evidentiary predicate. From the omnibus reservoir of proffered facts, the parties confect varying evidentiary predicates so as the better to serve their respective needs. The appellant basically would like the evidentiary predicates in this case to be large, for the larger they are, the greater the likelihood that they will constitute the double jeopardy that subsection 6-205(f) was

designed to protect against. The State, on the other hand, engages in a heroic effort to keep those evidentiary predicates as compact and tightly limited as possible and, thereby, to reduce the threat of overlapping double jeopardy. Which approach, if either, did the Maryland General Assembly intend?

As the appellant moves to add one more of the facts from the omnibus proffer of facts to its arguable evidentiary predicate for the fourth-degree burglary conviction, for instance, the State will cry, "Stop. We already have enough. Spare us the corroboration." That, however, is not the test. Subsection 6-205(f) welcomes not only evidence that is necessary. It welcomes all evidence that is even relevant. It welcomes the corroboration. The qualifying test is not necessity but relevance.

From the rich reservoir of evidentiary material available in the omnibus proffer of supporting facts, the parties in this case could, in order to serve their purposes, construct a wide variety of evidentiary predicates. They could construct the least legally sufficient evidentiary predicate that could survive a legal sufficiency ruling. They could, on the other hand, construct an overwhelmingly luxuriant evidentiary predicate that no one could plausibly deny. Or they could, of course, construct a more average evidentiary predicate at any point in between. There is no such thing as **THE** evidentiary predicate. Self-evidently, there is in this range of possibilities a large measure of uncertainty. When the evidentiary predicate on which the fourth-degree burglary is <u>based</u> turns out to be a big and abundant one, it is thereby far more likely, of course, to overlap the evidentiary predicate which <u>established</u> the theft conviction. The size of the evidentiary predicate is a major factor in the assessment of double jeopardy.

An evidentiary predicate for a criminal conviction is not, of course, a static thing, although the parties in a case like this will readily argue as if it is. A successful evidentiary predicate, of course, is a body of proof that supports a finding of guilt. But is the case that needs to be measured in terms of its evidentiary support a strong case of guilt or a weak case? Is it a barely minimal case of guilt that some judge somewhere might rule to be enough to satisfy legal sufficiency? Is it what the court watchers might characterize as a "cliffhanger?" That is what the State would like for a small evidentiary predicate is far less likely to overlap a near neighbor and thereby to constitute double jeopardy.

Or is it, by dramatic contrast, a powerful and overwhelming case, corroborated in half a dozen separate ways? Is it what the court watchers would salute as a "slam dunk?" "Slam dunks" frequently overlap. There is nothing improper, moreover, about an attorney's effort to transform his case from a "cliffhanger" into a "slam dunk." That is simply good practice. The only thing that is improper is to pretend that the strategically advantageous selection of proffered facts was somehow legally mandated. An attorney's careful construction of an evidentiary predicate is a stratagem, not a mandate.

Or is it an average case among the dozens and dozens of intermediate possibilities hovering somewhere in that vast chasm of indeterminate and ambiguous status between the two extremes on the "slam dunk" – "cliffhanger" scale?

The parties in this case both argue, of course, for the extremes. They simply prefer different extremes. They are carefully tailoring their respective evidentiary predicates in order to achieve or to avoid double jeopardy. They are presuming to measure the respective evidentiary predicates without clearly defining what it is that they are supposed to be

22

measuring. But what in that respect did the Legislature intend? Self-evidently, the task of making a comparison cannot even begin until the definitions have stopped floating.

## The State's Argument: Comparing Two Floating Definitions

The State's total argument on this precise point is very skimpy. At the very outset of its "Argument" section, it states its thesis that "under the facts of his case, his convictions for theft scheme and fourth-degree burglary were supported by separate facts as articulated at his plea hearing." That may be true but it may not be true. The State selected from the omnibus proffer enough facts to support a legally sufficient case of theft and enough facts to support a legally sufficient case of fourth-degree burglary and, to be sure, those sets of facts did not totally overlap. The State, however, had defined the respective evidentiary predicates narrowly in order to avoid such an overlap. Ignoring the almost limitless possibilities for the sizes of the respective evidentiary predicates, the State presumed to decide what, among many options, **THE** evidentiary predicate should be. For purposes of comparison, the State selectively gave us for the theft conviction and for the burglary conviction two modest "cliffhangers" that, indeed, did not totally overlap. The State chose, of course, to ignore more generous "slam dunks" that would massively have overlapped. The slender State's argument concludes:

> What Alexander fails to appreciate is that, <u>because his convictions for theft scheme and fourth-degree burglary are supported by separate conduct</u>, he was properly convicted of and sentenced for both crimes.

(State's Br. 9 (emphasis supplied).)

23

The State did, indeed, support the convictions "by separate conduct" but other and larger evidentiary predicates could have also served to support the convictions by overlapping conduct. From the available building material, the State constructed and proceeded to argue a legally sufficient base to support the conviction for fourth-degree burglary. It was not, however, a case with any corroboration or embellishment notwithstanding the fact that the available building material could easily have supported such corroboration and embellishment. Strategically, the State chose to construct and to argue a narrower case. Does that strategic choice by the State thereby make the State's choice of an evidentiary predicate necessarily **THE** evidentiary predicate that must be analyzed? Of course not. Which then will the interpretation of subsection 6-205(f) prefer?

### Statutory Interpretation: Stage One: The Statute Will Be Liberally Interpreted

As we endeavor to discern how much of the evidence, how many of the facts, contained in the State's omnibus statement of supporting facts should be assigned to each of the evidentiary predicates in this case in order then to compare them for double jeopardy purposes, the plain words of subsection 6-205(f) in a vacuum do not solve that problem for us. Mercifully, we are not dependent on those plain words in a vacuum. As Judge Harrell explained in <u>Lockshin</u>, we read those words for a deeper insight:

> <u>We</u>, however, <u>do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone</u>. Rather, <u>the plain language must be viewed within the context of the statutory scheme</u> to which it belongs, <u>considering the purpose, aim, or policy of the Legislature in enacting the statute</u>.

412 Md. at 275-76 (emphasis supplied and internal citations omitted).

24

Chief Judge Bell spoke of the same necessary insight in <u>Alston v. State</u>, 433 Md. 275 (2013):

> On the other hand, <u>the court will look beyond the statute's plain language</u> in discerning the legislative intent when there is statutory ambiguity, when the statutory language is unclear. In that event, <u>we may, and do, look elsewhere for evidence of the General Assembly's intent, considering, in addition to the literal or usual meaning of the words used, their meaning and effect in light of the setting, the objectives and purpose of the subject enactment</u>.

433 Md. at 296 (emphasis supplied and internal citations omitted); *see also* <u>State v. Johnson</u>, 415 Md. 413 at 421 ("[T]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.") (emphasis supplied)

How then do we read the legislative intent of the General Assembly in enacting subsection 6-205(f)? As we read the plain words of the statute in the context of the clear purpose of the statute, we include as part of the implicit evidentiary predicate of the case on which the conviction from the fourth-degree burglary (subsection 6-205(c)) was <u>based</u>, all of the evidence that was <u>relevant</u> to the proof of that case. We give a liberal interpretation to the words of the statute in order to better serve the clear purpose of the statute. The clear purpose of subsection 6-205(f) is to enhance the protection of the defendant from the risk of double jeopardy. That is, indeed, subsection 6-205(f)'s only function. That is the only thing that it does. It indisputably is not designed to restrain or to limit the defendant's protection from double jeopardy. It is indisputably to enhance that protection.

25

The theft conviction, to be sure, covered the appellant's conduct for a larger period of time, from May 3, 2021 through and including June 7, 2021, as opposed to the appellant's possession of the <u>mens</u> <u>rea</u> of an "intent to commit theft" on the single day of June 7, 2021. In terms of indispensable evidence, therefore, it necessitated significantly more by way of proof than did the fourth-degree burglary of June 7. The necessity for a bigger evidentiary predicate, in terms of legal sufficiency, however, by no means foretells an evidentiary predicate that is necessarily bigger.

The case against the appellant for fourth-degree burglary on June 7, 2021 required proof that on that day he possessed the <u>mens</u> <u>rea</u> of an "intent to commit theft." That is the minimum that would be legally sufficient. Proof that he possessed the same <u>mens</u> <u>rea</u> on each and every day of the 34 days leading up to June 7, 2021, albeit far from necessary, was certainly relevant and served to corroborate the <u>mens</u> <u>rea</u> on June 7. It was a strategically advantageous embellishment. Proof that the appellant actually committed acts of theft from the same victim and from the same house on other days preceding June 7 helped to reinforce the proof of the <u>mens</u> <u>rea</u> on June 7 itself. Does not a recent history of having had such <u>mentes</u> <u>reae</u> contribute to the greater likelihood of such a <u>mens</u> <u>rea</u> today? We think it does. It is not only a reasonable inference. It resonates with almost Newtonian certainty.

Proof that the appellant used the same <u>modus</u> <u>operandi</u> for the month preceding the fourth-degree burglary corroborated and strengthened the proof of that same <u>modus</u> <u>operandi</u> as proof of the appellant's <u>mens</u> <u>rea</u> on June 7. Everything that went into a good but relatively average case of proving (<u>establishing</u>) the conviction for theft was relevant

and helped to fortify what became a "slam dunk" of the case for fourth-degree burglary. The entire <u>establishing</u> of the theft conviction all became part of a luxuriant <u>base</u> for the fourth-degree burglary conviction. This was proof of a pervasive pattern of behavior. It was a broad base. This was thereby a case of double jeopardy for the same conduct. The double jeopardy protection does not distinguish between strong jeopardy and weak jeopardy, between broad jeopardy and narrow jeopardy.

The rule, of course, is that we interpret all of the evidence proffered by the State liberally in order to enhance the protection of the appellant against double jeopardy, which is the purpose of the statute. That means employing for that purpose all <u>relevant</u> evidence. That means not only the direct evidence but also all inferential evidence. The key question is not was this piece of evidence necessary but was this piece of evidence relevant. The fourth-degree burglary conviction was <u>based on</u> a slam dunk of a case. There is nothing wrong with that. We must take an expansive view of the double jeopardy protection, not a miserly one. We must welcome all reasonable inferences and the factual predicates for those inferences.

So what exactly is a liberal interpretation? A liberal interpretation of subsection 6-205(f) means finding and stressing reasons to apply that subsection's self-proclaimed purpose of guarding against double jeopardy. It does not mean finding and stressing reasons to restrict or to withhold that protection. Generally speaking, a mandated liberal interpretation of a statute at the very least suggests smiling on that statute.

**The Legislative Back Story:**
**The Committee To Revise The Criminal Law**

In addition to reading the plain words of the statute in the context of the state's clear purpose, it can also be enlightening to probe, at a second level of analysis, what Judge McDonald in Oglesby v. State, 441 Md. 673, 689, 109 A.3d 1147 (2015), dubbed the "back story." Even when, after our first level of examining the words of a statute the legislative intent is perspicuously clear, it may still be enlightening to look at the second level of analysis, the legislative back story. As Oglesby explained, "In the interest of completeness, courts may consider the legislative history of even an unambiguous statute to confirm the meaning of a statute derived from its language." 441 Md. at 689 n.9 (citing Higginbotham v. Public Service Commission, 412 Md. 112, 119, 985 A.2d 1183 (2009)).

In looking for that back story, the Revisor's Note to Section 6-205 states that the statute was derived without substantive change from former Article 27, Sect. 32. Article 27, Sect. 32, in turn had been enacted in 1994 as one part of an extensive revision and restructuring of the statutory law governing burglary by Chapter 712 of the Acts of 1994. The Committee Note to what became subsections 6-205(c) and 6-205(f), written by the Committee to Revise Article 27, expressly states:

> The Committee recognizes that the crime of theft and the crime established by subsection (b) [3] of this section each include an element that is not included in the other offense. Therefore, a conviction for a violation of subsection (b) would not merge into a conviction for theft. However, the Committee believes that a completed theft should not be prosecuted under this section.

(Emphasis supplied.)

---

[3]     What the Committee Note referred to as "subsection b" is now subsection 6-205(c).

28

Subsection 6-205(f) is thus indisputably aimed at accomplishing what the Committee Note stated was the intended purpose of the new statutory provision. It would qualify for double jeopardy protection pursuant to subsection 6-205(f) even if it did not necessarily qualify as an act of double jeopardy pursuant to <u>Blockburger v. United States</u>, 284 U.S. 299 (1932).[4] At this second level of analysis, the legislative back story fully reaffirms our reading of the plain words of subsection 6-205(f) at the first level of analysis. The appellant's case was thus "twice blest."[5]

## A Milieu Of Uncertainty:
## A Litigational Kiss Of Death

From the very outset of this controversy over the legality of the sentence for fourth-degree burglary, the State has sought to exploit the heretofore uninterpreted wording of subsection 6-205(f) in order to create at least a milieu of uncertainty about the precise meaning of the statutory provision. Cherry-picking selective facts from the omnibus proffer of facts, it argued that the precise evidentiary predicate on which the burglary conviction was <u>based</u> was not the same exact evidentiary predicate that <u>established</u> the theft conviction and that the two convictions, therefore, were not for the same offense. The State sought to

---

[4]    At various times in the early 1990's, incidentally, two of the members of this appellate panel sat on the judicial committee appointed to review and revise the criminal law, although in neither case for the full life of the committee. The committee was chaired by Judge Joseph Murphy, at that time an associate judge of what was then the Court of Special Appeals. Neither of the two members of this appellate panel, however, has any direct memory of ever participating in any consideration of the proposed legal changes that later became subsections 6-205(c) and 6-205(f).

[5]    William Shakespeare, <u>The Merchant of Venice</u>, act 4, sc. 1. Portia is describing the "quality of mercy."

confine itself to the direct evidence and to ignore the inferential evidence. Seeking to create uncertainty, however, may have been a counterproductive strategy. From the State's point of view, uncertainty can be a litigational kiss of death. Courting uncertainty can be playing with nitroglycerin.

Uncertainty is the primordial breeding ground for the Rule of Lenity.

### A Redundant Tiebreaker:
### The Rule Of Lenity

We are not quite finished with our treatment of subsection 6-205(f). Even if it should be a completely redundant resource under the circumstances, there is yet a third analytic prism through which we may examine subsection 6-205(f) in this case. It is the Rule of Lenity. The definitive statement of the Rule of Lenity is that made by Judge McDonald in Oglesby:

> When a court construes a criminal statute, it may invoke a principle known as the "rule of lenity" when the statute is open to more than one interpretation and the court is otherwise unable to determine which interpretation was intended by the Legislature. Instead of arbitrarily choosing one of the competing interpretations, the court selects the interpretation that treats the defendant more leniently. The rule of lenity is not so much a tool of statutory construction as a default device to decide which interpretation prevails when the tools of statutory construction fail.

441 Md. at 676. (Emphasis supplied.)

This Rule of Lenity is not a guideline helping us to resolve an ambiguity. It is the final decision itself. If, after all of the reading of the plain words of the statute in the context of the statute's purpose backstopped by the legislative history of the statute, some uncertainty and some ambiguity yet remains, some action, not further equivocation, is called for.

30

The jolt, the jumpstart, of the Rule of Lenity is sometimes necessary to kick the decision-making machinery back into action following a stoppage caused by uncertainty and ambiguity. The Rule of Lenity dictates that there will be no indecision. The Rule of Lenity is a bugle call. It is not Taps. Nor is it Retreat. It is Boots and Saddles, the classic call to action. The cavalry is on the way. The case is back in motion. The case is not back in motion because the ambiguity has been resolved. It is back in motion notwithstanding the unresolved ambiguity.

Although much of the caselaw casually refers to the Rule of Lenity as the ultimate interpretive guideline, Judge McDonald's painstakingly thorough analysis in Oglesby makes it clear that the Rule of Lenity does not resolve an ambiguity. It proclaims the winner of the case when the ambiguity cannot be resolved. It is the final tiebreaker:

> The "rule of lenity" is not a rule in the usual sense, but an aid for dealing with ambiguity in a criminal statute. Under the rule of lenity, a court confronted with an otherwise unresolvable ambiguity in a criminal statute that allows for two possible interpretations of the statute will opt for the construction that favors the defendant. For a court construing a statute, the rule of lenity is not a means for determining – or defeating – legislative intent. Rather, it is a tie-goes-to-the-runner device that the court may turn to when it despairs of fathoming how the General Assembly intended that the statute be applied in the particular circumstances.

441 Md. at 681 (emphasis supplied); *see also* Randall Book Corp. v. State, 316 Md. 315, 327, 558 A.2d 715 (1989); Jones v. State, 336 Md. 255, 261-62, 647 A.2d 1204 (1994); Tapscott v. State, 343 Md. 650, 656-57, 684 A.2d 439 (1996); Briggs v. State, 413 Md. 265, 286, 992 A.2d 433 (2010); Gardner v. State, 420 Md. 1, 17, 20 A.3d 801 (2011); State v. Weems, 429 Md. 329, 344-45, 55 A.3d 921 (2012).

The Rule of Lenity is a legal response to uncertainty and ambiguity. It is the tiebreaker. Uncertainty and ambiguity are conditions, of course, favorable to defendants. The defendant wants a tie for the obvious reason that he will win the tiebreaker. In circumstances calling for the Rule of Lenity, a defendant should, therefore, look upon uncertainty and ambiguity as Brer Rabbit once cannily looked upon the briar patch. He can't wait to be thrown into it. When the Rule of Lenity is to be applied, for the defendant to be in the midst of uncertainty and ambiguity is truly to be right in the middle of the briar patch. In Oglesby, the Maryland Supreme Court aptly described both the briar patch and its dispositive consequences:

> Instead of arbitrarily choosing one of the competing interpretations, the court selects the interpretation that treats the defendant more leniently.

441 Md. at 676 (emphasis supplied).

In Alston v. State, Chief Judge Bell referred to the same definitive tilt in favor of the defendant:

> [The rule of lenity] is applicable to penal statutes that are ambiguous, requiring that such statutes be strictly construed against the State and in favor of the defendant.

433 Md. 275 at 296 (emphasis supplied); *see also* Monoker v. State, 321 Md. 214, 222, 582 A.2d 525 (1990) ("[W]e, in effect, give the defendant the benefit of the doubt[.]"). Any shred of residual doubt is resolved in favor of the defendant.

Uncertainty and ambiguity foretold that the appellant would win. The Rule of Lenity was there as the ultimate tiebreaker if the appellant had needed it. He did not. The appellant's case was thus "thrice blest."

32

## Three Hypothetical Evidentiary Predicates

So, where are we? In a subsection 6-205(f) analysis, if the operative hypothetical is that the evidentiary predicate that was the <u>base</u> for the fourth-degree burglary conviction was a cliffhanger of a case, using just a few of the proffered facts from the omnibus proffer, the State may well prevail.

If that operative hypothetical were an average and more intermediate body of proof, the question of which party will prevail would be far more debatable. Mercifully, such a version of the evidence is not now before us.

But if the hypothetical evidentiary predicate on which the fourth-degree burglary conviction was <u>based</u> was a slam dunk of a case, using essentially all of the proffered facts from the omnibus proffer both to prove directly and to provide reasons to infer, the appellant will almost certainly prevail. In determining how many of the proffered facts may be deemed to have been the <u>base</u> for the fourth-degree burglary conviction, the controlling rules and interpretive guidelines tilt decisively in favor of defendants. They did so in this case.

## An Inconsequential Wrinkle

For those who read the words of the statute with meticulous precision, another small wrinkle of a problem might appear to beset us. In subsection 6-205(f), the forbidden double jeopardy is sequential. There first occurs the theft conviction. What is then forbidden is a conviction for fourth-degree burglary that might follow thereafter. In the case before us, by contrast, the two convictions occurred simultaneously. The controlling principles are exactly the same, however, and this sequential distinction is a distinction without a

33

difference. The sequential double jeopardy that subsection 6-205(f) forbids is, by parity of reasoning, also forbidden contemporaneously.

## Our Holding

Construing subsection 6-205(f) liberally so as to enhance the appellant's protection against double jeopardy, we hold that all of the relevant evidence that underlined the appellant's conviction for theft pursuant to Section 7-104 was relevant and, therefore, admissible in the case against him for fourth-degree burglary pursuant to subsection 6-205(c). It helped to prove, it corroborated, it reinforced the proof of his mens rea of an intent to commit theft on June 7, 2021. It helped to build the "slam dunk" of a case on which the fourth-degree burglary conviction was ultimately based.

At the second level of analysis, we find that the legislative history of both subsection 6-205(c) and subsection 6-205(f) confirms our reading of the General Assembly's statutory intent at the first level of analysis.

The Rule of Lenity then reaffirmed that decision that had already been twice affirmed. Accordingly, the conviction for subsection 6-205(c) was forbidden by subsection 6-205(f). We hereby vacate that conviction and its sentence.

We do not deem a remand for resentencing under Count Five to be necessary because the vacating of the sentence for Count Three can have no meaningful impact on the actual sentence for Count Five. Count Five, to be sure, will no longer be "consecutive." We discern no meaningful difference, however, between not being "consecutive" to anything and being "consecutive" to nothing.

## A Wistful Afterthought

Subsection 6-205(f) is, indeed, a fascinating and <u>sui</u> <u>generis</u> little oddity of criminal procedure. It would seem to have posed a single and apparently simple question. Yet it has necessitated an extended analysis on our part even to begin to grapple with that not-so-simple question. In a strange new world of far-flung spin-offs from ancient origins, the very passage by our General Assembly of this small nugget of criminal procedure, now hidden deep within the family of burglary-related offenses, emits a distant glimmer from the bygone world of <u>autrefois</u> <u>convict</u>. Subsection 6-205(f) is but a faint whisper of Common Law history; yet it speaks multitudes.

**JUDGMENT OF CONVICTION ON COUNT THREE VACATED; COSTS TO BE PAID BY WICOMICO COUNTY.**

35